**CEMEX, S.A., Plaintiff,**

and

**Apasco, S.A. de C.V., Plaintiff–Intervenor,**

v.

**UNITED STATES of America and United States International Trade Commission, Defendants,**

and

**The Ad Hoc Committee of AZ–NM–TX–FL Producers of Gray Portland Cement, Defendant–Intervenor.**

**Court No. 90–10–00509.**

United States Court of International Trade.

April 7, 1992.

See also 765 F.Supp. 745.

Skadden, Arps, Slate, Meagher & Flom, Thomas R. Graham, John J. Mangan, John J. Burke, Albert J. Boro, Jr., Erik O. Autor, Catherine Kane Ronis, Roger B. Banks, Washington, D.C., for plaintiff.

O'Connor & Hannan, Joseph H. Blatchford, Guy C. Smith, Washington, D.C., for plaintiff-intervenor.

Lyn M. Schlitt, Gen. Counsel, U.S. Intern. Trade Com'n, James A. Toupin, Asst. Gen. Counsel, Judith M. Czako, Washington, D.C., for defendant.

Kilpatrick & Cody, Joseph W. Dorn, Martin M. McNerney, Michael P. Mabile, Atlanta, Ga., for defendant-intervenor.

RESTANI, Judge.

In *Gray Portland Cement and Cement Clinker From Mexico*, 55 Fed.Reg. 35,371 (ITC 1990), the United States International Trade Commission ("ITC") determined that a regional domestic industry in the United States was materially injured by reason of cement imports from Mexico. CEMEX, S.A., a Mexican producer of cement, appeals from the determination, and now moves for judgment on the agency record. ITC's determination is affirmed.

## I.

### BACKGROUND

The Ad Hoc Committee of AZ–NM–TX–FL Producers of Gray Portland Cement ("Ad Hoc Committee") represents certain cement producers with production facilities in Arizona, New Mexico, Texas and Florida. On September 26, 1989, Ad Hoc Committee filed a petition with ITC and the Department of Commerce ("Commerce"), alleging injury to a United States industry by reason of less than fair value ("LTFV") imports of gray portland cement and cement clinker from Mexico. ITC and Commerce issued affirmative preliminary determinations. *See Gray Portland Cement and Cement Clinker From Mexico*, USITC Pub. 2235, Inv. No. 731–TA–451 (Nov.1989); *Gray Portland Cement and Clinker From Mexico*, 55 Fed.Reg. 13,817 (Dep't Comm.1990).

ITC reached a final determination on August 13, 1990, and issued an opinion on August 23, 1990. *Gray Portland Cement and Cement Clinker From Mexico*, USITC Pub. 2305, Inv. No. 731–TA–451 (Aug.1990) (*"Final Det."*). It determined that a United States industry, composed of producers of gray portland cement and cement clinker in the southern-tier states, was materially injured by reason of LTFV imports of cement and cement clinker from Mexico.

Prior to the final determination, a committee of cement producers in Southern California had filed a petition with ITC and Commerce alleging material injury due to LTFV cement imports from Japan. By the time of the final determination in this case, ITC had made a preliminary affirmative determination in the Japanese case, (*Gray Portland Cement and Cement Clinker From Japan*, USITC Pub. 2297, Inv. No. 731–TA–461 (July 1990) (*"Japan Cement"*)), but Commerce had not issued its preliminary or final determinations regarding LTFV sales.

## II.

### ITC DETERMINATION

Three Commissioners participated in ITC's final determination. Commissioner Rohr made a negative determination, which is not at issue. Acting Chairman Brunsdale and Commissioner Lodwick made affirmative determinations, and each issued an opinion. Both opinions are challenged here.

Acting Chairman Brunsdale first determined that cement and cement clinker comprise a single like product. She then found that a regional industry analysis was appropriate, and that the regional industry consisted of producers in the southern-tier states of California, Texas, Arizona, New Mexico, Alabama, Louisiana, Mississippi

and Florida. She determined that cumulation was mandatory, and cumulatively assessed the volume and price effects of Mexican and Japanese imports into the region: her consideration of Japanese imports was based on the allegations in the Japanese case, as recalculated by Commerce. She then considered whether there was material injury to the domestic industry based on the statutory factors. She found that the financial performance of the southern-tier producers had deteriorated during the period of investigation, and applied an elasticities analysis to determine the volume, price and overall effect of the dumped imports on the domestic industry. She concluded that the domestic industry was materially injured by reason of LTFV imports from Mexico. Finally, she found that the statutory requirements for injury in a regional investigation had been met, and that all producers were injured because they were not insulated from the general effect of the injurious imports.

Commissioner Lodwick's determination was based on a slightly different analysis. He concurred with Acting Chairman Brunsdale's findings about like product, regional industry, and cumulation. He then found deterioration in the financial performance of the domestic industry, and considered whether there was material injury by reason of LTFV imports. He found evidence of a significant volume of imports, underselling, depression of domestic prices, and an adverse impact on the domestic injury. Based on all these factors, he found material injury by reason of LTFV imports from Mexico. Finally, he concluded that the statutory criteria for injury in a regional investigation had been met because the effect of the imports was felt throughout the region, and there was no evidence to indicate that individual producers were not injured.

---

1. 19 U.S.C. § 1677(4)(C) provides, in part:

    In appropriate circumstances, the United States, for a particular product market, may be divided into 2 or more markets and the producers within each market may be treated as if they were a separate industry if—

## III.

## STANDARD OF REVIEW

ITC's determination shall be upheld unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1988).

## IV.

## DISCUSSION

### A. *Regional Industry Analysis*

CEMEX challenges ITC's regional industry analysis on two grounds: misinterpretation of the "all or almost all" standard; and failure to employ a disaggregate analysis, or an aggregate approach with a safeguard to ensure an accurate finding is made.

### 1. *"All, or Almost All" Standard*

■ ITC's task is to determine whether an industry in the United States is materially injured, or threatened with material injury by reason of imports or sales at LTFV. *See* 19 U.S.C. § 1673d(b)(1) (1988). An industry consists of "domestic producers as a whole of a like product, or those producers whose collective output of the like product constitutes a *major proportion* of the total domestic production of that product." 19 U.S.C. § 1677(4)(A) (1988) (emphasis added). Under certain circumstances set forth in the statute, ITC may divide the United States into two or more regional markets, and treat producers in each market as a separate industry. 19 U.S.C. § 1677(4)(C) (1988). In such cases, material injury to an industry may be found "if the producers of *all, or almost all*, of the production" within the regional market suffer material injury due to the dumped imports. *Id.* (emphasis added) ("regional injury provision").[1]

    (i) the producers within such market sell *all or almost all* of their production of the like product in question in that market, and
    (ii) the demand in that market is not supplied, to any substantial degree, by producers of the product in question located elsewhere in the United States.

Here, ITC found that the region consisted of producers in the southern-tier states; it then found material injury to producers of "all or almost all" of the cement production in the region. *Final Det.*, at 51, 66. CEMEX argues, however, that the decision is flawed because the "all or almost all" language requires a finding of material injury to eighty or eighty-five percent of production, and no such finding was made in this case. CEMEX bases its argument on case law and ITC practice under a parallel statutory provision. This authority is not persuasive.

CEMEX cites the *Atlantic Sugar* cases.[2] In *Atlantic Sugar, Ltd. v. United States*, 2 CIT 295 (1981) (*Atlantic Sugar III*), the court considered the "all or almost all" provision. It found that "all or almost all" constitutes more than a "major proportion" of production, which is the standard required in a nationwide determination (*see id.* at 301), and in dicta noted that seventy-six percent of production might not constitute "all or almost all" of the production.[3] *Id.* at 301–302. In finding the issue of injury to a producer of one-quarter of the production determinative in the context of

the disaggregate analysis at issue in *Atlantic Sugar V*, the Federal Circuit seems to accept that, at least for purposes of disaggregate analysis, seventy-five percent of production is not "all or almost all." *Atlantic Sugar*, 744 F.2d 1556, 1562–63 (Fed.Cir.1984). Whatever remains of the teaching in *Atlantic Sugar III*, that opinion certainly does not stand for the proposition that an eighty percent threshold is required in every case. Moreover, the appellate decision does not provide guidance on the appropriate measure if an aggregate analysis is used.

CEMEX notes that in addition to the regional injury provision, the "all or almost all" language is found in a second place in 19 U.S.C. § 1677(4)(C). *See supra*, n. 1. This second provision states that ITC may adopt a regional industry approach if producers within the region sell "all or almost all" of their production in that region ("regional market provision"). CEMEX argues that ITC interprets the regional market provision to require at least an eighty percent threshold, and that this interpretation is relevant in the first context.

---

In such appropriate circumstances, material injury, the threat of material injury … may be found to exist with respect to an industry … if there is a concentration of subsidized or dumped imports into such an isolated market and if the producers of *all, or almost all,* of the production within that market are being materially injured or threatened by material injury…. 19 U.S.C. § 1677(4)(C) (1988) (emphasis added).

**2.** The *Atlantic Sugar* cases involved judicial review of the ITC determination in *Sugars and Sirups from Canada*, USITC Pub. 1047, Inv. No. 731–TA–3 (Mar.1980), in which ITC held that LTFV sugar imports from Canada in 1978 and 1979 caused material injury to a regional industry in the United States.

The *Atlantic Sugar* cases may be found at the following citations: *Atlantic Sugar, Ltd. v. United States*, 1 CIT 211, 511 F.Supp. 819 (1981) (*Atlantic Sugar I*) (denying motion for remand); 2 CIT 18, 519 F.Supp. 916 (1981) (*Atlantic Sugar II*) (remanded for reconsideration following discovery of errors in underlying data); 2 CIT 295 (1981) (*Atlantic Sugar III*) (remanded for ITC to consider injury to individual producers before determining whether all or almost all production injured); 4 CIT 248, 553 F.Supp. 1055 (1982) (*Atlantic Sugar IV*) (remanded for ITC to exclude from consideration plant data

from outside region); 6 CIT 190, 573 F.Supp. 1142 (1983) (*Atlantic Sugar V*) (vacating final determination because ITC considered plant data from outside region).

On appeal, the Federal Circuit reversed *Atlantic Sugar V*, and reinstated the ITC determination. *Atlantic Sugar*, 744 F.2d 1556 (Fed.Cir. 1984). In dicta the Federal Circuit found that ITC's determination was supported by substantial evidence, and ITC did not err in considering plant data from outside the region because it was the best information available. *Id.* at 1562. The Federal Circuit also criticized the CIT's decision in *Atlantic Sugar III*, which had required a producer-by-producer analysis to determine whether producers of all or almost all production in the region were materially injured. *Id.* at 1562 & n. 27.

**3.** The court noted:
If this point is reached in the administrative determinations the Court does not presently see how the remaining 76 percent of production can be considered to be "all or almost all." It would seem that the plain meaning of this statutory requirement could only be satisfied by a percentage which came closer to being all the production. Nevertheless, … the Court will not foreclose the possibility of such a conclusion at this time.
2 CIT at 301–302.

■ It is true, as CEMEX claims, that the court may apply parallel constructions when a phrase appears more than once in the same provision of a statute. *See United States v. Nunez*, 573 F.2d 769, 771 (2d Cir.), *cert. denied*, 436 U.S. 930, 98 S.Ct. 2828, 56 L.Ed.2d 774 (1978). Where, however, the contexts and purposes of the provisions differ, parallel constructions are inappropriate. *See, e.g., Laffey v. Northwest Airlines, Inc.*, 567 F.2d 429, 461–62 n. 230 (D.C.Cir.1976), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1281, 55 L.Ed.2d 792 (1978). It is not the case, as CEMEX claims, that ITC has established a fixed eighty percent threshold in the regional market context. *See Operators for Jalousie and Awning Windows From El Salvador*, USITC Pub. 1934, at 9, Inv. Nos. 701–TA–272, 731–TA–319 (Jan.1987) (roughly eighty or eighty-five percent of production must remain in region to satisfy "all or almost all" criterion but fixed percentages not applied automatically or uniformly). Nevertheless, even if ITC had established such a percentage in the regional market context, a numerical analysis would not be appropriate under the regional injury provision. As Ad Hoc Committee and the government correctly point out, the analysis required by the regional market provision is more readily quantifiable than the analysis under the regional injury provision. In the first context, ITC is merely required to find *sale* of all or almost all production into the region; in the second context, ITC must find *injury* to all or almost all production. *See* 19 U.S.C. § 1677(4)(C). In the second context, numerous factors must be considered and a quantitative analysis is inappropriate.[4]

In short, there is nothing in the statute, case law, or administrative practice to indicate Congressional intent to bind ITC to a precise numerical percentage. Indeed, the legislative history in the analogous context of a nationwide investigation indicates that Congress intended determinations to be made on a case-by-case basis. *See* S.Rep. No. 249, 96th Cong., 1st Sess., at 83 (1979) ("[w]hat constitutes a major proportion of total domestic production will vary from case to case depending on the facts, and no standard minimum proportion is required in each case"); H.R.Rep. No. 317, 96th Cong., 1st Sess., at 73 (1979) ("phrase 'major proportion of total domestic production' cannot be defined with mathematical precision, and the application of the phrase will therefore vary from case to case"). Thus, ITC's determination is not contrary to law simply for failure to apply a fixed percentage test in the range of eighty to eighty-five percent.

### 2. Aggregate or Disaggregate Analysis

In determining whether producers of "all or almost all" of the production have been injured, CEMEX claims, in essence, that a disaggregate analysis using individual plant data is required. CEMEX argues that analysis of aggregate data, without examination of individual plant information, leads to erroneous results. CEMEX claims an aggregate analysis was used in this case.

■ ITC has broad discretion in the choice of its methodology. *See Smith–Corona Group v. United States*, 713 F.2d 1568, 1571 (Fed.Cir.1983), *cert. denied*, 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984). "As long as the agency's methodology and procedures are reasonable means of effectuating the statutory purpose, and there is substantial evidence in the record supporting the agency's conclusions, the court will not ... question the agency's methodology." *Ceramica Regiomontana v. United States*, 10 CIT 399, 404–05, 636 F.Supp. 961, 966 (1986), *aff'd*, 810 F.2d 1137 (Fed.Cir.1987).

Neither the statute nor case law cited by CEMEX requires a particular method of

---

**4.** CEMEX's reliance on a decision of the Canadian International Trade Tribunal, which construed language similar to that found in the regional injury provision, is misplaced. Without passing on the precedential value of cases from the Canadian International Trade Tribunal, it is sufficient to note that the Tribunal has not established the fixed percentage analysis that CEMEX advocates. *See Fertilizer Equipment*, 14 C.E.R. 290, 304–305 (1987) ("all" means 100 percent, and "almost all" means close to 100 percent; seventy-five percent falls short of all or almost all).

analysis in a regional industry investigation. In fact, CEMEX has cited only one decision in which this court required a producer-by-producer analysis. *See Atlantic Sugar III,* 2 CIT 295. As indicated, that decision was criticized on appeal, and in dicta, the Federal Circuit indicated that the statute did not require a disaggregate analysis. *Atlantic Sugar,* 744 F.2d at 1562 n. 27 (no basis in statute or legislative history for requiring ITC to examine individual producers).[5]

Nevertheless, although a pure producer-by-producer analysis is not required by statute, examination of individual plant information can highlight anomalies that an aggregate analysis would disguise. Indeed, in other cases ITC has considered the condition of regional industries on the basis of aggregate data, then considered certain plant-specific information to ensure that the "all or almost all" standard is satisfied. *See, e.g., Certain Welded Carbon Steel Pipes and Tubes From Taiwan,* USITC Pub. 1994, at 13–15, Inv. No. 731–TA–349 (July 1987) (final); *Rock Salt From Canada,* USITC Pub. 1658, at 12 n. 28, Inv. No. 731–TA–239 (Mar.1985) (preliminary).[6] ITC did not deviate from this general approach here.

ITC gathered plant-specific information (*see* List No. 2, Doc. 30, App. E), and the Commissioners are presumed to have considered all evidence in the record. *Metallverken Nederland B.V. v. United States,* 14 CIT —, —, 744 F.Supp. 281, 286 (1990). Indeed, it is apparent from the Commissioners' opinions that they considered and rejected contentions by the Mexican producers that certain plants were unaffected by the dumped imports.

The Mexican producers had argued that the "all or almost all" standard was not satisfied because: (1) domestic producers brought in a large percentage of Mexican imports which they were responsible for pricing; and (2) a substantial number of producers were not injured because imports either were not present or did not constitute an important factor in their local marketing areas. Acting Chairman Brunsdale rejected these arguments because: (1) the decision by domestic producers to import rather than produce was based in part on the low price of Mexican imports; and (2) data concerning the plant-by-plant effects of the dumped imports was unreliable. *Final Det.,* at 48–51.[7] She concluded that the evidence was sufficient to satisfy the "all or almost all" standard based on her finding that cement is "quite substitutable" and "there are no product differences

---

**5.** CEMEX also cites *Copperweld Corp. v. United States,* 12 CIT 148, 682 F.Supp. 552 (1988). *Copperweld* is not persuasive since it merely stated in dicta that a disaggregate analysis is authorized in a regional case, as opposed to a nationwide investigation in which the industry as a whole is to be examined. *Id.* at 166 & n. 14, 682 F.Supp. at 569 & n. 14. In addition, *Copperweld* relied in part on the Federal Circuit's decision in *Atlantic Sugar,* which, as noted in the text, criticized a producer-by-producer analysis. *Id.* Other cases cited by CEMEX hold, like *Copperweld,* that an aggregate analysis is proper where no allegation of a regional industry is made. *See Sandvik AB v. United States,* 13 CIT 738, 746, 721 F.Supp. 1322, 1330 (1989) (dicta), *aff'd,* 904 F.2d 46 (Fed.Cir.1990) (table); *National Ass'n of Mirror Mfrs. v. United States,* 12 CIT 771, 778, 696 F.Supp. 642, 647–48 (1988) (dicta). These cases do not require a disaggregate analysis in a regional industry case.

**6.** In a recent case, ITC stated that a producer-by-producer analysis is inappropriate, but noted that ITC "has generally considered the condition of regional industries on an aggregated basis,

and has looked to individual producer information as a secondary matter." *Gray Portland Cement and Cement Clinker From Japan,* USITC Pub. 2376, at 22–23 n. 51, Inv. No. 731–TA–461 (Apr.1991) (views of Commissioners Lodwick and Newquist).

**7.** Specifically, Acting Chairman Brunsdale found:

First, the material was not presented with sufficient transparency to allow assessment of the methodology's correctness. Secondly, it seems to me that the effects of the imports should be analyzed in each local market and these effects then averaged to obtain the effects on each plant rather than averaging the values of the various parameters, such as the level of the unfair imports, to obtain a plant level value. Finally, petitioners raised serious questions about the appropriateness of adjusting for the cost of transportation separately for each market while assuming the dumping margin remained constant throughout the region.

*Final Det.,* at 51 n. 120.

that would shield some producers from the injury being suffered by others."[8] *Final Det.*, at 48.

As for Commissioner Lodwick, he explicitly states that he examined the record pertaining to individual producers. *Final Det.*, at 66 n. 53. Like Acting Chairman Brunsdale, he rejected the argument that a substantial number of producers were not injured because imports were not present in their marketing areas, or did not play an important role. He found that producers throughout the region were affected due to the "ripple effect," or the practice of transporting shipments from the area of competition to surrounding areas, where, in turn, other shipments were displaced. *Final Det.*, at 66 n. 52.[9]

The record indicates that the Commissioners considered appropriate plant-specific information in determining whether producers of "all or almost all" production were affected by the dumped imports. It appears, however, that the Commissioners simply did not accept the argument that certain producers were not injured by the dumped imports. Thus, the court concludes that a complete disaggregate analysis is not required; to the extent that some safeguard is required to assure that the "all or almost all" standard is met, it was

satisfied by examination of data regarding individual plants. CEMEX has not demonstrated that ITC's conclusions regarding this data were unsupported by substantial evidence.

### B. *Cumulation*

To determine the volume and effects of imports, Acting Chairman Brunsdale cumulated Mexican imports with Japanese imports subject to investigation in *Japan Cement*, and considered the dumping margins alleged in that case in her elasticities analysis.[10] CEMEX claims that reliance on the Japanese dumping margins violates the statute and due process because the margins were unverified. Ad Hoc Committee and the government maintain that CEMEX has waived this argument.

■ A litigant may not raise an issue for the first time on appeal. *See Wieland Werke, AG v. United States*, 13 CIT 561, —, 718 F.Supp. 50, 55 (1989). "A reviewing court usurps the agency's function when it sets aside a determination upon a ground not previously presented and deprives the agency of an opportunity to consider the matter, make its ruling, and state the reasons for its action." *Id.* (citations

---

**8.** CEMEX argues that Acting Chairman Brunsdale's conclusion that cement is fungible is contradicted by another part of the opinion, in which she found that cement was not "perfectly" fungible due to high transportation costs. *See Final Det.*, at 37. CEMEX has misstated the Commissioner's findings. The Commissioner found that the elasticity of substitution between domestic cement and imports was in the range of 5 to 7. *Id.* at 38. This was lower than argued by the domestic producers (who contended it should be 10), higher than contended by the Mexican producers (who contended it should be 5), and in the lower end of the range proposed by ITC staff (5–10). Thus, there is no real contradiction between her findings that cement is "quite" substitutable for purposes of the regional injury determination and her conclusion that it is not "perfectly" substitutable for purposes of the elasticities analysis.

In any event, based on the record before the court, I find that her consideration of transportation costs for purposes of the elasticities analysis adequately accounts for the effects on individual producers of any uneven distribution of the dumped cement. *See Final Det.*, at 45–46 n. 109.

**9.** In its reply brief, CEMEX argues that the Commissioner's findings concerning the "ripple effect" were not based on evidence in the record. CEMEX is incorrect. *See* List No. 1, Doc. 33, Ex. 3, at 7–8 and 10–11 (written testimony of Jon R. Thompson) (describing "ripple" effects of competition from Mexican imports and displacement of domestic cement from southern and coastal Texas to northern markets); List No. 1, Doc. 161, Econ.App. A, at 27–28 (even if sold only in coastal area, imports affect prices inland through "ripple" or "spillover" effect). The producers' questionnaire responses also contain evidence concerning the ripple effect.

**10.** Although the dumping margins were drawn from the preliminary determination in *Japan Cement*, the Acting Chair noted that, except for certain refinements, the margins were as alleged by petitioner. *Final Det.*, at 34 n. 80. Use of alleged as opposed to preliminary margins is not significant for purposes of this discussion because, as Ad Hoc Committee points out, both are unverified by Commerce.

omitted). The same rule applies with respect to constitutional claims. *See Youngberg v. Romeo,* 457 U.S. 307, 316 n. 19, 102 S.Ct. 2452, 2458 n. 19, 73 L.Ed.2d 28 (1982).

ITC is permitted to cumulate imports that are subject to investigation as of the date of the Commission's vote in the investigation before it. *See Chaparral Steel Co. v. United States,* 901 F.2d 1097, 1104–05 (Fed.Cir.1990). Acting Chairman Brunsdale's practice is to use dumping margins in her elasticities analysis, and in previous cases she has cumulated imports in a final investigation with imports on which Commerce has found preliminary margins, then used those margins in her analysis. *Certain Light–Walled Rectangular Pipes and Tubes From Taiwan,* USITC Pub. 2169, at 26, Inv. No. 731–TA–410 (Mar.1989) (final); *Certain Fresh Cut Flowers From Canada, Chile, Colombia, Costa Rica, Ecuador, Israel, and The Netherlands,* USITC Pub. 1956, at 94 n. 34, Inv. Nos. 701–TA–275 to 278 and 731–TA–327 to 331 (Mar. 1987) (final). In addition, in the preliminary determination in *Japan Cement,* which was one month before the final determination in this case, the Acting Chair considered the alleged Japanese margins and the preliminary Mexican margins. *Japan Cement,* at 19–21. Hence it should not have come as any surprise to CEMEX that she considered the alleged Japanese margins in this case.

More important for purposes of waiver is the fact that Ad Hoc Committee filed a prehearing brief in this case in which it argued in favor of cumulation of Mexican and Japanese imports, and factored into its suggested analysis the alleged Japanese margins. *See* List No. 1, Doc. 161, at 25–29; List No. 2, Doc. 13, Econ.App. G, at 18 & Table 2. CEMEX's only response was that cumulation was improper because the Japanese and Mexican investigations involved different regional industries. List No. 1, Doc. 163, at 57–62. At no time did CEMEX argue that reliance on the unverified margins was error, nor did it raise the constitutional and policy arguments it raises for the first time before this court. Had it done so, Acting Chairman Brunsdale might have reconsidered her methodology, or at least the issue would have been discussed and preserved for review by this court. Accordingly, CEMEX has waived arguments concerning the use of alleged Japanese margins.

Despite its failure to raise the issue below, CEMEX urges the court to address the issue of the alleged margins. The interests of justice do not compel such a result: Acting Chairman Brunsdale did not simply accept the alleged margins as fixed percentages. She considered in her analysis the likelihood that the margins might diminish, which they did. *Final Det.,* at 34 n. 80. The final margins, however, did not diminish to a low level, but remained "relatively high," which is the term used by Acting Chairman Brunsdale to describe the Mexican margins. *Id.* at 34. In fact, ultimately the Japanese margins were determined to be very close to the Mexican margins. The final margins are not part of the record. The court simply points out that the surrounding circumstances do not call for application of some exception to the general rule of exhaustion.

### C. *Price Underselling and Price Suppression or Depression*

█ In determining whether there is material injury, ITC is required to consider the following factors: volume of imports; price effect of imports; impact of imports on production operations; and other relevant economic factors. 19 U.S.C. § 1677(7)(B) (1988). In evaluating the price effect of imports, ITC is to consider whether:

(I) there has been significant price underselling by the imported merchandise as compared with the price of like products of the United States, and

(II) the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree.

19 U.S.C. § 1677(7)(C)(ii) (1988). CEMEX claims several errors with respect to ITC's determination under this provision.

Commissioner Lodwick examined price data for Japanese imports to determine

whether underselling occurred. *Final Det.*, at 62. This price information was drawn from price tables in the confidential staff report in the Japanese investigation. *Id.* at 62 n. 40. CEMEX claims the price data was not part of the record in this case, and Commissioner Lodwick erred when he relied on it.

Although the price tables were incorporated by reference into the record (*see Final Det.*, at A–74 n. 91) (citing *Japan Cement*, USITC Pub. No. 2297, at A–72 to A–85),[11] they were confidential and were not released to the parties. Nevertheless, CEMEX was not prejudiced because the questionnaire responses on which the price tables were based were released to the parties under an administrative protective order on July 11, 1990. *See* List No. 2, Doc. 33F. As the price information was part of the record, Commissioner Lodwick's consideration of this information was entirely appropriate.[12]

CEMEX also argues Commissioner Lodwick's conclusion about price underselling rests on erroneous data. ITC sent questionnaires to United States importers and producers requesting information about sales within a certain volume range (300–700 tons).

According to CEMEX, the majority of producers did not comply with the request. Over seventy percent of reported producer sales were for quantities either above or below the stipulated range. In contrast, according to CEMEX, over seventy percent of reported importer sales were for quantities within the stipulated range. ITC staff calculated weighted-average sales prices based on all reported sales, and did not limit its calculations to sales within the

range. CEMEX claims that comparisons within the volume range do not support a finding of underselling, at least not to the same degree. CEMEX claims Commissioner Lodwick might have reached a different conclusion concerning price effects had comparable volumes been used.

■ Contrary to arguments of Ad Hoc Committee and the government, CEMEX raised this argument before ITC and has preserved it for review. *See* List No. 1, Doc. 163, at Ex. 39. Nevertheless, the argument fails. It is based on the premise that volume discounts exist, yet there is absolutely no evidence *in this case* to indicate volume discounting. Moreover, a finding of underselling is not crucial to an affirmative determination. A finding of suppressive price effects may be sufficient. *Florex v. United States*, 13 CIT ——, ——, 705 F.Supp. 582, 593 (1989). In this case, Commissioner Lodwick found LTFV imports had depressed prices to a "significant degree." *Final Det.*, at 64. Although he found evidence of underselling, he did not describe it as "significant"; therefore, it appears that his findings concerning price underselling were not determinative. Accordingly, even if the underselling analysis was defective in some manner, a remand for consideration of this factor would be pointless.

CEMEX also claims error because Acting Chairman Brunsdale did not discuss price underselling in her opinion.[13] CEMEX argues consideration of price underselling is required by statute. *See* 19 U.S.C. § 1677(7)(C)(ii)(I). To determine the price effect of imports, ITC is required to *consider* whether price underselling occurred. *Id.* Although ITC is required to explain its

---

**11.** Apparently, the citation in the final determination in this case is to the *confidential* version of the report in *Japan Cement*. In the *public* version, the price tables are found elsewhere. *See Japan Cement*, at A–56 to A–57.

**12.** CEMEX also argues that the price information from the investigation in *Japan Cement* was "incomplete" and does not constitute substantial evidence. This argument is meritless. In cases involving cumulation, commissioners may have to rely on incomplete investigations. Commissioner Lodwick relied on the Japanese price information for his finding that underselling

occurred in Orange County, California. The information was given appropriate weight in his determination, and CEMEX does not even allege that the information was inaccurate.

**13.** In the alternative, CEMEX argues that if Acting Commissioner Brunsdale considered price underselling, her opinion was flawed, as was Commissioner Lodwick's, for failure to consider volume discounting. The court's discussion of Commissioner Lodwick's decision disposes of this argument.

analysis of price effects, *see* 19 U.S.C. § 1677(7)(B), there is no requirement that it set forth its findings concerning underselling. Acting Chairman Brunsdale found that dumped imports depressed or suppressed domestic prices. *Final Det.*, at 46. It appears that she does not find anecdotal evidence of underselling or lack thereof determinative. To require findings of underselling would be inconsistent with the proposition that price suppression or depression is sufficient.

Finally, CEMEX argues that both Commissioner Lodwick's and Acting Chairman Brunsdale's findings with respect to price depression or suppression were erroneous because they must necessarily depend on an incomplete investigation of Japanese price data. This is not a ground for finding the determination unsupported. *See supra* n. 12. Also, CEMEX appears to argue that Acting Chairman Brunsdale may not have considered any price data to confirm her general economic conclusions; specifically, CEMEX argues that she did not relate prices of imports to declining or suppressed domestic prices. It appears that Acting Chairman Brunsdale is not making general economic conclusions, but is attempting to draw conclusions about the effect of actual prices through use of economic theory. To the extent that CEMEX asks the court to conclude that Acting Chairman Brunsdale ignores pertinent information in the record, the court declines to do so. There is no basis for such a conclusion. Furthermore, CEMEX cites no persuasive authority, and the statute does not require ITC to assess the price-depressing or suppressing effects of imports in any particular manner. *See* 19 U.S.C. § 1677(7)(C)(ii).

## V.

### CONCLUSION

As ITC's determination was based on substantial evidence and CEMEX has failed to demonstrate legal error, the determination is affirmed.