SLIP OP. 04-152

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: RICHARD K. EATON, JUDGE

————————————————————————
                                              :
ELKEM METALS CO.,  APPLIED                    :
INDUSTRIAL  MATERIALS CORP., AND              :
CC METALS & ALLOYS, INC.                      :
                                              :
           PLAINTIFFS,                        :
                                              :
     v.                                       :     CONSOL. COURT NO. 99-00628
                                              :
UNITED STATES OF AMERICA,                     :
                                              :
           DEFENDANT.                         :
————————————————————————:

[Defendant's motion for reconsideration denied; opinion and order in *Elkem VI* modified and clarified]

Dated: December 3, 2004

*Piper Rudnick, LLP* (*William D. Kramer*, *Martin Schaefermeier*, and *Clifford E. Stevens, Jr.*), *Eckert Seamans Cherin & Mellott, LLC* (*Dale Hershey*), and *Howrey Simon Arnold & White, LLP* (*John W. Nields, Jr.* and *Laura S. Shores*) for Plaintiff Elkem Metals Co.

*Williams Montgomery & John, Ltd.* (*Theodore J. Low*) for Plaintiff Applied Industrial Materials Corp.

*Arent Fox Kintner Plotkin & Kahn, PLLC* (*George R. Kucik*) for Plaintiff CC Metals & Alloys, Inc.

*Dangel & Mattchen, LLP* (*Edward T. Dangel, III*) for Plaintiff-Intervenor Globe Metallurgical, Inc.

*Lyn M. Schlitt*, General Counsel, United States International Trade Commission, *James M. Lyons*, Deputy General Counsel, United States International Trade Commission (*Marc A. Bernstein*) for Defendant.

*Kaye Scholer, LLP* (*Julie C. Mendoza*) for Defendant-Intervenor Ferroatlantica de

1

Venezuela.

       *Hogan & Hartson, LLP* (*Mark S. McConnell*) for Defendant-Intervenor General Motors Corp.

       *Greenberg Traurig, LLP* (*Philippe M. Bruno*) for Defendant-Intervenors Associao Brasileira dos Productores de Ferroligas e de Silico Metalico, Companhia Brasileira & Companhia Ferroligas, Nova Era Silicon S/A, Italmagnesio S/A-Industria e Comercio, Rima Industrial S/A, and Companhia Ferroligas Minas Gerais-Minasligas.

MEMORANDUM OPINION AND ORDER

EATON, *Judge*:   This matter is before the court on the motion for reconsideration of Defendant United States International Trade Commission ("ITC" or "Commission") pursuant to USCIT Rule 59(a), (e).  By its motion, the ITC asks the court to reconsider portions of its most recent decision in this action.  Familiarity with that decision is presumed.  *See Elkem Metals Co. v. United States,* 28 CIT __ , slip op. 04-49 (May 12, 2004) (not reported in the Federal Supplement) ("*Elkem VI*").  In *Elkem VI*, the court considered whether an established price-fixing conspiracy was a significant condition of competition that had affected prices charged by U.S. ferrosilicon producers during the Prior Period, the Conspiracy Period, and the Subsequent Period.[1]  *Id.* at 28 CIT __, slip op. 04-49 at 8.  As the court has sustained the ITC's determination

---

[1]     The "Original POI" covered the period from 1989 through 1993.  *See Elkem Metals Co. v. United States*, 27 CIT __, __, 276 F. Supp. 2d 1296, 1299 (2003) ("*Elkem V*").  The "Conspiracy Period" is the period from late-1989 through mid-1991.  *Id.*, 27 CIT __, __, 276 F. Supp. 2d at 1300.  The portion of the Original POI preceding the Conspiracy Period, i.e., the first three quarters of 1989, is referred to as the "Prior Period."  The portion of the Original POI following the Conspiracy Period, i.e., from mid-1991, to mid-1993, is referred to as the "Subsequent Period."

with respect to the Prior Period and the Conspiracy Period,[2] the Commission directs its motion to matters relating to the Subsequent Period. The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2000) and 19 U.S.C. § 1516a(a)(2)(B)(ii) (2000). The granting of a motion for rehearing, reconsideration, or retrial under Rule 59(a) is within the sound discretion of the court, *Kerr–McGee Chem. Corp. v. United States*, 14 CIT 582, 583 (1990) (not reported in the Federal Supplement); however, a court will not normally do so unless the decision at issue is "manifestly erroneous." *Ammex, Inc. v. United States*, 26 CIT __, __, 201 F. Supp. 2d 1374, 1375 (2002). Although the ITC's arguments do not rise to the level of the "manifestly erroneous" standard, they are meritorious in some respects. Therefore, the court will treat the Commission's motion as one for modification and clarification. *See Federal-Mogul Corp. v. United States*, 17 CIT 1110, 834 F. Supp. 1388 (1993).

By its motion, the ITC seeks reexamination of the court's holding that substantial evidence did not support the Commission's finding that the price-fixing conspiracy affected prices during the Subsequent Period. In the brief supporting its motion, the ITC insists that the court erred in three specific respects: (1) that "[t]he Court misunderstood a [c]entral [ITC] [f]inding" with respect to pricing patterns, (2) that "the Court improperly remanded [to] the [ITC] on grounds not raised by Plaintiffs," and (3) that "[s]everal of the remand instructions . . . appear to require the [ITC] to engage in inquiries that do not reflect the requirements of the antidumping

---

[2] The court sustained the finding that the price-fixing conspiracy was a significant condition of competition that affected prices during the Conspiracy Period, *see Elkem V*, 27 CIT at __, 276 F. Supp. 2d at 1313; and, following remand, that the price-fixing conspiracy was not a significant condition of competition during the Prior Period, *see Elkem VI*, 28 CIT at __, slip op. 04-49 at 8.

and countervailing duty laws." Mot. of Def. ITC for Reconsideration ("Def.'s Mot.") at 8, 10, 5.

For the reasons set forth below, the court modifies and clarifies portions of its Opinion and Order

in *Elkem VI*.

DISCUSSION

I.      The Court Did Not Misunderstand a Central Commission Finding

First, the ITC claims that the court misunderstood the "cental commission finding" that

"'the conspirators'[3] pricing patterns did not significantly shift in the period following the

Conspiracy Period. . . ." Def.'s Mot. at 8. In *Elkem VI*, the court found that

> substantial evidence does not support the ITC's conclusion that the
> price-fixing conspiracy affected prices during the Subsequent
> Period. The ITC based this conclusion on its finding that "there
> are no significant differences in pricing patterns between the latter
> part of the Conspiracy Period and the Subsequent Period." The
> ITC found that the effects of the conspiracy were felt in the
> Subsequent Period because . . . there was "no significant shift in
> the conspirators' pricing patterns with respect to other domestic
> producers in the period following the Conspiracy Period," i.e., the
> Conspirators "frequently maintained higher prices or failed to
> match domestic competitors' price declines in the Subsequent
> Period . . . ."

*Elkem VI*, 28 CIT at __, slip op. 04-49 at 15–16 (internal citation omitted). Consequently, as part

of its holding, the court found that substantial evidence did not support the ITC's finding that the

Conspirators "frequently maintained higher prices." *Id.* at 16.

---

[3]      The conspirators were plaintiffs Elkem Metals Co., American Alloys, Inc., and
SKW Metals & Alloys, Inc., the predecessor firm to CC Metals & Alloys, Inc. *See Elkem V*, 27
CIT at __, 276 F. Supp. 2d at 1300.

The ITC, however, argues that the court misunderstood the Commission's finding:

> The manner in which the Court framed the Commission's finding does not comport with the Commission's description of its finding quoted above. In its opinion, the Commission did not make a categorical finding that the Conspirators "frequently maintained higher prices." Instead, it stated that the Conspirators "frequently maintained higher prices *or* failed to match competitors' price declines" . . . the word "frequently" was clearly intended to modify both clauses of the sentence.

Def.'s Mot. at 9 (emphasis in original). Thus, the ITC apparently claims that its finding should properly be read as—the Conspirators *frequently* maintained higher prices or *frequently* failed to match competitors' price declines. Indeed, that is how the court read the Commission's words. This being the case, it is difficult to see how the ITC would be relieved from the requirement that it support, with substantial evidence, its finding that the conspirators "frequently maintained higher prices." *Elkem VI*, 28 CIT at __, slip op. at 16. As CC Metals ("CCM") points out:

> [T]he agency asks that Part II.B. of the opinion be rescinded because the Court read the first part of the ITC's statement that the conspirators "frequently maintained higher prices or failed to match competitors price declines," to mean what it plainly says – that the conspirators frequently maintained higher prices.

CCM's Opp'n to Def.'s Mot. for Reconsideration ("CCM's Opp'n") at 3.

It may be that the Commission wished to express a different thought than was conveyed by the plain meaning of the words used in the Second Remand Determination.[4] Nonetheless, the record contains only the quoted words, and it is those that must be considered. The court finds

---

[4]     *See* Ferrosilicon from Brazil, China, Kazakhastan, Russia, Ukraine, and Venezuela, USITC Pub. 3627, Invs. Nos. 303-TA-23, 731-TA-566-570, and 731-TA-641 (Sept. 2003), List 1, Doc. 620R ("Second Remand Determination").

that, as the ITC relies on the entire sentence to justify its determination, it must provide

substantial evidence to support the meaning of the entire sentence.   On remand, the ITC may

explain itself more clearly but, in any event, it must support its findings by complying with the

evidentiary standard.


The ITC also insists that the court's criticism with respect to its failure to address

marketplace conditions was the result of the court's misunderstanding of the Commission's

Remand Determination.  *See* Def.'s Mot. at 9.  Here, however, the ITC appears to have

misunderstood the court's criticism.  The ITC states that it need not examine marketplace

conditions in order to justify its findings based on a comparison of the prices charged by the

conspirators, and those charged by non-conspiring domestic producers, because both "were

facing the same marketplace conditions." Def.'s Mot. at 10.  In this assertion, the ITC is no

doubt in the right.  The court's observations, however, were substantially directed at the ITC's

conclusion that "prices charged by both the conspirators *and the domestic industry as a whole*

during the Subsequent Period were not the result of competitive marketplace conditions." *Elkem*

*VI*, 28 CIT at __, slip op. 04-49 at 22 (quoting Second Remand Determination at 13) (emphasis

added).  Absent a discussion of market conditions, the court found the Commission's assertion

that non-market factors elevated all domestic producers' prices to be unjustified.  Indeed, it is not

immediately obvious to the court how the ITC can continue to make this finding without

discussing marketplace conditions.  That is, if the Commission believes prices for the industry as

a whole were not set by the market, it must substantiate this belief.  Because a discussion of

market conditions would have been useful in determining if the Commission's findings were

supported by substantial evidence, the court declines to accept the ITC's invitation to reconsider

its opinion in this respect.

II. The Court Properly Remanded to the ITC

The ITC next argues that the court improperly remanded this matter on grounds not raised

by Plaintiffs. Def.'s Mot. at 10. Specifically, the ITC argues that CCM, the lone responding

party, did not challenge the findings relating to pricing patterns and the effect of long-term

contracts on those pricing patterns. As a result, the ITC maintains:

> The Court should reconsider its decision to review [the]
> Commission['s] factual findings *sua sponte*. There is no authority
> of which we are aware–and none is cited by the Court–providing
> the Court the authority to challenge a factual finding in a
> Commission determination when a litigant has not done so. To the
> contrary, 28 U.S.C. § 2639(a)(1) emphasizes that, in actions such
> as the instant case brought before the Court of International Trade:
>
> > the decision of the . . . International Trade
> > Commission is presumed to be correct. The burden
> > of proving otherwise shall rest upon the party
> > challenging such decision.
>
> Consequently, the plain language of the statute makes clear that *a
> litigant* has the burden of challenging the Commission's decision.
> When a litigant does not attempt to discharge this burden, the
> Commission's decision must be presumed to be correct. The
> statute does not contemplate that a reviewing court can challenge
> the Commission's decision on theories it raises *sua sponte*.

Def.'s Mot. at 11–12.

First, 28 U.S.C. § 2639(a)(1) (2000), the statute cited by the Commission, primarily

addresses the burden of proof as between the litigants. The scope and standard of review for this

case, however, is governed by 28 U.S.C. § 2640(b) (2000) and 19 U.S.C. § 1516a(b)(1)(B)(i) (2000), which provide that the Court of International Trade "shall hold unlawful any determination, finding, or conclusion found . . . unsupported by substantial evidence on the record, or otherwise not in accordance with law." Thus, the court bases its holding on its review of the record.

Second, from the commencement of this case, the Plaintiffs' central claim has been that the price-fixing conspiracy was ineffective. *See, e.g.*, CCM Compl. ¶ 56 (Oct. 28, 1999) and CCM Compl. ¶ 56 (April 19, 2001) (stating that the Commission's presumption that "the price-fixing conspiracy had successfully eliminated price competition between the U.S. commodity ferrosilicon producers and the importers [was] factually and legally erroneous . . . and otherwise not in accordance with the law"); *see also* Elkem Comments on ITC's Remand Determination at 6 ("[I]n this particular case, the conspiracy to keep prices *up* was largely ineffective in the face of the flood of low-priced imports.") ( Oct. 18, 2002). Hence, the ITC cannot now claim that this issue has been raised here for the first time, or that it is surprised in any way that questions continue to be raised about the effect of the conspiracy during the Subsequent Period.

Third, this matter is now before the court following remand, and the court is examining the extent to which the ITC has complied with, or failed to comply with, the court's remand instructions beginning with *Elkem V*.[5] "There can be no question that courts have inherent power

---

[5]    The court in *Elkem V* instructed:

On remand the ITC shall . . . (1) state with specificity the

to enforce compliance with their lawful orders . . . ."  *Shillitani v. United States*, 384 U.S. 364,

370 (1966); *see Hook v. Arizona, Dept. of Corrections*, 972 F.2d 1012, 1014 (1992) ("A district

court retains jurisdiction to enforce its judgments . . . ."); *cf.* 28 U.S.C. § 1585 (2000) ("The

Court of International Trade shall possess all the powers in law and equity of . . . a district court

of the United States.").  Thus, the court is unconvinced by the Commission's contention that it

may not review underlying issues pertaining to its own remand instructions.

III.     The Court's Remand Instructions

     A.     True Market Price

With respect to the remand instructions themselves, the ITC complains that

> several of the remand instructions the Court formulated . . . appear to require the Commission to engage in inquiries that do not reflect the requirements of the antidumping and countervailing duty laws.  These [instructions] direct the Commission to quantify price effects and to attempt to calculate what market prices would have been under different conditions of competition than those actually present in the market.

Def.'s Mot. at 5.  The ITC then directs its attention to three of these instructions.

The first instruction to which the ITC objects reads: "On remand, the ITC shall (1)

_____

> evidence that the price-fixing conspiracy affected prices during the entire Original POI; (2) weigh the evidence in the record concerning those portions of the Original POI where the conspiracy was not judicially found to be operative [i.e., the Prior Period and Subsequent Period]; and (3) explain with specificity what information in the record, if any, supports the adverse inference made on remand that the conspiracy affected prices during the periods preceding and following the Conspiracy Period.

*Elkem V*, 27 CIT at __, 276 F. Supp. 2d at 1315-16.

determine the 'true' market price the ITC referenced in its Second Remand Determination at 10

. . . ." *Elkem VI*, 28 CIT at __, slip op. 04-49, at 19. According to the ITC, "[T]he Court's

instructions compelling the [ITC] to derive quantitative measures of pricing on remand is not

consistent with the statutory provisions of the antidumping and countervailing duty laws, their

legislative history, or the pertinent case law." Def.'s Mot. at 7. In other words, the ITC claims

that the antidumping and countervailing duty laws do not require it to quantify its findings. This

instruction, however, like the other remand instructions to which the ITC specifically objects, is

based on the court's conclusion that substantial evidence did not support the ITC's findings as to

pricing. Specifically, the first challenged instruction was meant to address a portion of the ITC's

conclusion that "the data indicate that there were no sudden shifts in domestic ferrosilicon

producers' pricing patterns immediately after the conclusion of the Conspiracy Period." *Elkem*

*VI*, 28 CIT at __, slip op. 04-49 at 16 (internal quotation omitted). In its Second Remand

Determination, the ITC stated:

> [I]n the third quarter of 1991 (the quarter immediately following
> the last quarter of the Conspiracy Period), prices charged by both
> the conspirators and the domestic industry as a whole were higher
> than those of the immediately preceding quarter. By contrast, if the
> effects of the conspiracy on prices were limited solely to the
> Conspiracy Period, *one would expect an immediate decline* from
> prices established by a conspiracy, which would be at inflated
> levels relative to a "*true*" market price, to prices established by
> marketplace considerations.

Second Remand Determination at 11 (emphasis added).

As noted by CCM, it was the Commission, not this court, that introduced the notion of a

"true" market price into these proceedings. CCM's Opp'n at 2 ("[T]he ITC asks that it not be

required to respond to this Court's demand for further evidence and explanation to support

findings that were made by the ITC itself in the decision under review.") (emphasis omitted).

The purpose of the ITC's finding, as to an expected drop in prices following the Conspiracy

Period, was to substantiate its conclusion that the conspiracy affected prices beyond the

Conspiracy Period.  Having stated that finding, however, the ITC must support it with substantial

evidence.  As counsel for the ITC noted at oral argument:

> I think it's acknowledged by all the parties that a conspiracy would
> raise prices to levels higher than they would be absent a conspiracy
> and that was frankly the concept that the Commission was trying to
> get across.  If on the termination date of the Conspiracy Period the
> conspiracy ceased to exist and everything was determined by
> truly–by solely marketplace forces there would be other
> things–*other things being equal* . . . a decline in prices.

Tr. Civ. Cause for Mot. Reconsideration at 18.

The ITC's counsel has put his finger precisely on the problem, i.e., that "all other things

[were] equal."  Simply put, there is no indication that the ITC made an effort to determine if

marketplace conditions did remain equal, or changed in some material respect following the

Conspiracy Period.  The ITC cannot simply rely on the idea that "one would expect an immediate

decline from prices established by a conspiracy" without demonstrating that this expectation was

warranted by then-existing conditions.  Second Remand Determination at 11.  Thus, the ITC

must establish that the term "true market price" has some useful meaning.

On the invitation of the court following oral argument, the ITC now proposes that, if it

should continue to rely on the term "true market price," it will define the term and provide

substantial evidence supporting any findings it makes based on the use of the term, but should

not be required to quantify the term.  *See* Letter from ITC to the court of 8/30/04, at 2.[6]

Elkem objects to the ITC's proposal because, in its view, the change would mean that the

ITC could "no longer . . . be required to provide substantial evidence in support of any finding

regarding price changes that should have occurred absent continued effects from the conspiracy."

Elkem's Comments on ITC's Proposed Remand Instructions ("Elkem's Comments") at 6.  "The

court should make clear that, while quantification of the term "'true' market price" is not

required, any such finding must be supported by substantial evidence."  *Id.*

Although the ITC's complaints do not rise to a level sufficient for a finding that the

remand instruction is "manifestly erroneous," they do have merit.  Thus, the court finds that it

---

[6]     The ITC proposes to the court the following revised instructions pertaining to "true market price":

> The ITC shall (1) define the term "'true' market price" it referenced in its Second Remand Determination at 10, should it continue to desire to rely on the term, and provide substantial evidence supporting any findings it makes based on use of the term, but is not required to provide a quantification of the "'true' market price," (2) account for the factors it relied upon so heavily in its prior determinations, e.g., demand and U.S. apparent consumption, (3) clearly explain how these factors either support or do not support its finding that the conspiracy affected domestic prices in the Subsequent Period, and (4) evaluate the relevant economic factors it finds to exist in the marketplace for the entire Subsequent Period, not merely the first quarter of the Subsequent Period.

Letter from ITC to the court of 8/30/04, at 2.

may be possible for the ITC to make findings based on "true market price" that are supported by

substantial evidence without quantifying the actual price itself.  The court also finds that the ITC

may abandon the use of the term "true market price," although it is difficult to see how it can

persist in maintaining that the conspiracy affected prices in the Subsequent Period if it does so.

In order to clarify that all findings must be supported by substantial evidence, however, the court

incorporates Elkem's proposed instructions[7] into those proposed by the ITC.  The modified

remand instruction regarding "true market price" shall read as follows:

> Should it continue to rely on the term "true market price," the ITC
> shall (1) define the term "true market price" it referenced in its
> Second Remand Determination at 10, and provide substantial
> evidence supporting any findings it makes regarding price changes
> that should have occurred in the absence of continued effects from
> the conspiracy, including any findings based on use of the term
> "true market price," but is not required to provide a quantification
> of that term; (2) account for the factors it relied upon heavily in its
> prior determinations, e.g., demand and U.S. apparent consumption;
> (3) clearly explain how these factors either support or do not
> support its finding that the conspiracy affected domestic prices in
> the Subsequent Period; and (4) evaluate the relevant economic
> factors it finds to exist in the marketplace for the entire Subsequent
> Period, not merely the first quarter of the Subsequent Period.

---

[7]     Elkem proposes the following revised language to the court's instructions
regarding "true market price":

> The ITC shall . . . define the term "'true' market price" it
> referenced in its Second Remand Determination at 10, should it
> continue to desire to rely on the term, and provide substantial
> evidence supporting any findings it makes *regarding price changes*
> *that should have occurred in the absence of continued effects from*
> *the conspiracy, including any findings* based on use of the term
> "'*true' market price*", but is not required to provide a
> quantification of *that term. . . .*

Elkem's Comments at 6 (emphasis added).

B.        ITC Must State Price Differences With Specificity

Next, the ITC claims that, on remand, it should not be required to "state with specificity what difference in price it would consider material in the context of this inquiry, and why."[8] Def.'s Mot. at 5 (internal citation omitted).  This instruction results from the ITC's finding that there was "no significant shift in the [C]onspirators' pricing patterns with respect to other domestic producers in the period following the Conspiracy Period" and "prices charged by both the [C]onspirators and the domestic industry as a whole during the Subsequent Period were not the result of competitive marketplace conditions."  Second Remand Determination at 11, 13.

---

[8]        On remand, the court instructed the ITC to

> revisit its finding that the Conspirators frequently maintained higher prices than their domestic competitors in the Subsequent Period and (1) consider evidence with respect to the non-price factors that existed during the entire Subsequent Period, not only the first, second, third, and fourth quarters of that period, or explain the absence of such evidence in the record and the steps it has taken to account for any missing data, (2) state with specificity the non-price factors it found to exist during the Subsequent Period and explain their relevance to the ITC's finding that the Conspirators frequently maintained higher prices than their domestic competitors, (3) consider data for each of the Conspirators, i.e., disaggregate the pricing data, and either (a) identify sufficient record evidence to support its finding, or (b) reconsider whether the record fairly supports its finding, and (4) state with specificity what difference in price it would consider material in the context of this inquiry, and why.

*Elkem VI*, 28 CIT at __, slip op. 04-49 at 26–27.

While the court found that substantial evidence supported some of the ITC's findings used to reach this conclusion (i.e., "that the Conspirators' prices, considered in the aggregate, either declined by less or increased by fractions of a penny more than those of other domestic producers," *Elkem VI*, 28 CIT __, slip op. 04-49 at 22), the court also found that substantial evidence did not support the finding that the "Conspirators frequently maintained higher prices than their non-conspiring domestic competitors during the Subsequent Period." *Id.* at __, slip op. 04-49 at 23 (internal quotation omitted). The court discussed the evidence relating to this conclusion at some length in *Elkem VI*. Since the record indicates that "the data from the quarters considered by the ITC are, at best, mixed," the ITC must establish its finding "that there was 'no significant difference' in the incidence of underselling during the Conspiracy Period and the Subsequent Period" by substantial evidence.[9] *Elkem VI*, 28 CIT at __, slip op. 04-49 at 26, 32 (internal citation omitted). The remand instruction about which the ITC complains is designed to elicit from the ITC—even granting some greater prices—what price differential would be significant. As the court used the word "material" rather than the word "significant" in its instruction, the ITC may, if it wishes, comply with the instruction by substituting the word "significant."

### C.      Baseline Price

The ITC further objects to the court's observation that "[s]hould the ITC hope to establish by substantial evidence that the conspiracy affected prices during the Subsequent Period, a

---

[9]      The "data" referred to here was evidence examined by the court in *Elkem VI*. *See generally Elkem VI*.

baseline [price] would be useful." Def.'s Mot. at 5 (quoting *Elkem VI*, 28 CIT at __, slip op. 04-49 at 32). This observation refers to the ITC's underselling analysis and was preceded by the sentence:

> While it is true that the ITC was not explicitly obliged to go through the exercise of quantifying the effects the conspiracy had on prices during the Subsequent Period in order to find that the conspiracy affected prices during that time frame, it may well be that the demands of substantial evidence indicate its necessity in light of its previous findings.

*Elkem VI*, 28 CIT at __, slip op. 04-49 at 32.

Here, the court's observation should not be construed as a remand instruction but, rather, as guidance from the court as to the type of evidence that might be useful in order to satisfy the demands of substantial evidence, should the ITC continue to find that the conspiracy affected prices in the Subsequent Period.

D.      Disaggregation of Data

Finally, the ITC appears to object to the court's remand instruction that, in revisiting its finding that "the Conspirators frequently maintained higher prices than their domestic competitors in the Subsequent Period," it should "consider the data for each of the Conspirators, i.e., disaggregate the pricing data, and either (a) identify sufficient record evidence to support its finding, or (b) reconsider whether the record fairly supports its finding . . . ." *Elkem VI*, 28 CIT at __, slip op. 04-49 at 26. The ITC claims that "there is no explanation in the Court's opinion concerning why its instruction . . . is one required by the antidumping and countervailing duty law." Def.'s Mot. at 7.

While not specifically asking for any particular relief, it is apparent to the court that the ITC finds the instruction objectionable.  It is true that "the ITC has broad discretion in the choice of its methodology." *CEMEX v. United States*, 16 CIT 251, 255, 790 F. Supp. 290, 294 (1992), *aff'd*, 989 F.2d 1202 (Fed.Cir. 1993) ("As long as the agency's methodology and procedures are reasonable means of effectuating the statutory purpose, and there is substantial evidence in the record supporting the agency's conclusions, the court will not . . . question the agency's methodology") (internal quotation omitted).  Conclusions based on a chosen methodology, however, must still be based on substantial evidence.  The court has previously gone through the exercise of examining the pricing data found in the Remand Staff Report and found that it tended not to support the conclusion that "the Conspirators frequently maintained higher prices." *Elkem VI*, 28 CIT at __, slip op. 04-49 at 26.  Even with this in mind, the Commission's objections have some merit and it is possible that the ITC can respond to the court's concerns without disaggregating the data.  Thus, the court's remand instruction is amended to read as follows:

> (3) in revisiting its finding that the Conspirators frequently maintained higher prices than their domestic competitors during the Subsequent Period, consider the data for each of the Conspirators and either (a) disaggregate the pricing data or (b) explain why its method of aggregating the data is reasonable considering the court's discussion of that data, and, in any event, identify sufficient record evidence to support its finding, and explain how that evidence supports its finding.

### CONCLUSION

Upon consideration of the issues discussed herein, the court modifies and clarifies its Opinion and Order in *Elkem VI* as described herein, and denies the ITC's motion for

reconsideration.


       This matter continues to be remanded to the ITC.  Remand results are due within ninety days of the date of this order, comments are due thirty days thereafter, and replies to such comments eleven days from their filing.  Neither comments nor replies to such comments shall exceed thirty pages in length.


                                                _____/s/ Richard K. Eaton_____
                                                    Richard K. Eaton

Dated:  December 3, 2004
        New York, New York