**MITSUBISHI MATERIALS CORP.;**
Nihon Cement Co., Ltd.; and Osaka Cement, et al., Plaintiffs,

v.

**UNITED STATES** and United States International Trade Commission, Defendants,

v.

The **AD HOC COMMITTEE OF SOUTHERN CALIFORNIA PRODUCERS OF GRAY PORTLAND CEMENT,** Defendant–Intervenor.

Court No. 91–06–00426.

United States Court of International Trade.

April 27, 1993.

Plaintiffs challenge the final affirmative injury determination by the United States International Trade Commission ("Commission") in *Gray Portland Cement and Cement Clinker from Japan*, USITC Pub. 2376, Inv. No. 731–TA–461 (Final) (Apr.1991); also published at 56 Fed.Reg. 21,391 (USITC 1991) as amended 56 Fed.Reg. 22053 (USITC 1991). The court sustains the Commission's determination in part. The court also finds that the Commission's determination, in part, was not based upon substantial evidence or in accordance with law, and grants plaintiffs' request for a remand as to the relevant part.

## BACKGROUND

Defendant–Intervenor, the Ad Hoc Committee of Southern California Producers of Gray Portland Cement, filed an antidumping duty petition with the United States Department of Commerce ("Commerce") and the Commission on May 18, 1990. The petition alleged that imports of gray portland cement and cement clinker ("cement and cement clinker" or, collectively, "cement") from Japan were being sold in the United States at less than fair value, and that an industry in the United States was materially injured or threatened with material injury by reason of the imports.

Akin, Gump, Hauer & Feld, Patrick F.J. Macrory and Spencer S. Griffith, for plaintiffs Onoda Cement Co., Ltd.

Graham & James, Yoshihiro Saito and Brian E. McGill, for plaintiffs Mitsubishi Materials Corp., Nihon Cement Co., Ltd., and Osaka Cement Co., Ltd.

Office of Gen. Counsel, U.S. Intern. Trade Com'n (Lyn M. Schlitt, Gen. Counsel, James A. Toupin, Asst. Gen. Counsel, and Judith M. Czako), for defendants.

Kilpatrick & Cody, Joseph W. Dorn and Michael P. Mabile, for defendant-intervenor.

### *Memorandum Opinion*

GOLDBERG, Judge:

This action comes before the court on plaintiffs' motion for judgment upon the agency record and request for remand.

Plaintiffs, Mitsubishi Materials Corp., Nihon Cement Co., Ltd., Osaka Cement Co., Ltd., and Ube Industries, Ltd., along with plaintiff Onoda Cement Co., Ltd., were Japanese exporters of the subject imports and participated in the proceedings before the Commission and Commerce as respondents.

Commerce initiated an antidumping duty investigation on June 7, 1990. *Gray Portland Cement (Including Cement Clinker) from Japan*, 55 Fed.Reg. 24,295 (Dep't Comm.1990) (Initiation of Investigation). The period of investigation was December 1, 1989 through May 31, 1990. Although Commerce's notice of initiation requested that interested parties notify Commerce of support for or opposition to the petition, no timely challenges to petitioners' standing to file the petition on behalf of the industry were filed.

The Commission issued its affirmative preliminary determination .in July, 1990. *See Gray Portland Cement and Cement Clinker from Japan,* USITC Pub. 2297, Inv. No. 731–TA–461 (Prelim.) (July 1990); also published at 55 Fed.Reg. 28,465 (USITC 1990). Commerce issued its affirmative determination of sales at less than fair value on October 31, 1990. *Gray Portland Cement and Clinker from Japan,* 55 Fed.Reg. 45,831 (Dep't Comm.1990) (prelim. determination). ·

On February 13, 1991, plaintiffs filed a request that the Commission terminate its investigation on the grounds that defendant-intervenor did not represent the industry on whose behalf the petition was filed.

The Commission issued its final affirmative determination in April, 1991. *Gray Portland Cement and Cement Clinker from Japan,* USITC Pub. 2376, Inv. No. 731–TA–461 (Final) (Apr. 1991); also published at 56 Fed. Reg. 21,391 (USITC 1991), as amended 56 Fed.Reg. 22,053 (USITC 1991) ("Commission Report"). The Commission found that gray portland cement and clinker had a low value-to-weight ratio and was fungible. Further,. its high transportation costs tended to make the areas in which it was produced and marketed isolated and insular. Commission Report at 16, 17. Additionally, inventories were generally not maintained for long, or at high levels, because of the high costs of storage. Commission Report at 25.

The Commission also found that cement production was historically subject to cyclical performance, with poor performance in periods of low or declining consumption, and boom performance during periods of high or increasing consumption. Commission Report at 28. It concluded that "[o]ver the period of investigation, the cement market in Southern California was characterized first by a strong surge in demand, and by declining consumption in the most recent period." Commission Report at 28.

The Commission also found that, pursuant to 19 U.S.C. § 1677(4)(C) (1988), in April, 1991 a regional industry in the United States was materially injured or was threatened with material injury by reason of unfairly traded imports. · Commissioners Lodwick and Newquist ("the Commission majority")

determined that the relevant industry was materially injured. Through the use of an aggregate analysis which was highlighted by producer-by-producer information, the Commission majority found.that a sufficient percentage of the relevant industry was injured.

Also, in its determination, the Commission majority defined the regional industry as the domestic producers of cement in Southern California. In finding injury, the Commission majority cumulatively assessed the volume and effect of imports of a like product from Mexico with the subject Japanese imports. The cumulated Mexican imports were subject to an antidumping duty order issued on August ·30, 1990. *Gray. Portland Cement and Clinker from Mexico,* 55 Fed.Reg. 35,-443 (Dep't Comm.1990) (Antidumping Duty Order).

In a separate opinion, Commissioner Rohr found that the industry was threatened with material injury. Commissioner Rohr determined that the relevant industry was threatened by material injury based upon a "percentage of production" analysis. In this method, Commissioner Rohr examined aggregate indicators of industry performance as well as how aggregates were affected by individual plant performance. ·

The Commission majority and Commissioner Rohr also rejected plaintiffs' request for termination on the grounds that Commerce retained exclusive jurisdiction to make standing determinations and to decide challenges to standing. Finally, Commissioner Brunsdale issued a negative determination of injury.

On May 10, 1991, Commerce issued an antidumping duty order, and amended its final determination to find 63.73 percent and 45.29 percent weighted-average dumping margins. *Gray Portland Cement and Clinker from Japan,* 56 Fed.Reg. 21,658 (Dep't Comm.1991) (Antidumping Duty Order).

Both plaintiffs Mitsubishi Materials Corp. et al. and Onoda Cement Co., Ltd. filed separate complaints before this court challenging several aspects of the Commission majority's and Commissioner Rohr's determinations. Ube Industries, Ltd., however, withdrew as· a plaintiff on September 11,

1991. The court consolidated both actions together on November 1, 1991 under *Mitsubishi Materials Corp., et al. v. United States*, Consolidated Court No. 91–06–00426.

## DISCUSSION

### I. Standard of Review

An antidumping determination will be overturned only if it is not supported by substantial evidence on the record or otherwise not in accordance with law. 19 U.S.C. 1516a(b)(1)(B) (1988). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *N.A.R., S.p.A. v. United States*, 14 CIT 409, 412, 741 F.Supp. 936, 939 (1990) (quoting *Gold Star Co. v. United States*, 12 CIT 707, 708–709, 692 F.Supp. 1382 (1988) *aff'd*, 8 Fed.Cir. (T) ——, 873 F.2d 1427 (1989)). *See also Rhone Poulenc, S.A. v. United States*, 8 CIT 47, 50, 592 F.Supp. 1318 (1984).

The possibility of drawing two inconsistent conclusions from the evidence does not prevent the agency's finding from being supported by substantial evidence. *Consolo v. Federal Maritime Commission*, 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966). This standard of review accords deference to an agency's conclusions. It is not the court's function to decide that it would have made another decision on the basis of the evidence. *Matsushita Elec. Indus. Co. v. United States*, 3 Fed.Cir. (T) 44, 54, 750 F.2d 927 (1984). The court will affirm the determination of the Commission when it is reasonable and supported by the record as a whole, even where there is evidence which detracts from the substantiality of the evidence. *Atlantic Sugar, Ltd. v. United States*, 2 Fed.Cir. (T) 130, 136, 744 F.2d 1556 (1984).

Moreover, "if the statute is silent or ambiguous with respect to [a] specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron U.S.A. Inc. v. National Resources Defense Council Inc.*, 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984) (footnote omitted).

### II. Concentration of Imports

In an antidumping duty investigation, the Commission is charged with determining whether:

(A) an industry in the United States—

(i) is materially injured, or

(ii) is threatened with material injury, or

(B) the establishment of an industry in the United States is materially retarded,

by reason of imports. . . .

19 U.S.C. §§ 1671d(b)(1) (1988) and 1673d(b)(1) (1988).

When defining "industry," 19 U.S.C. § 1677(4)(C) (1988) provides that the Commission may, in appropriate circumstances, employ a regional analysis of the domestic industry. In these cases:

the United States, for a particular product market, may be divided into 2 or more markets and the producers within each market may be treated as if they were a separate industry if—

(i) the producers within such market sell all or almost all of their production of the like product in question in that market, and

(ii) the demand in that market is not supplied, to any substantial degree, by producers of the product in question located elsewhere in the United States.

In such appropriate circumstances, material injury [or] the threat of material injury . . . . may be found to exist with respect to an industry even if the domestic industry as a whole . . . is not injured, *if there is a concentration of . . . dumped imports into such an isolated market and if the producers of all, or almost all, of the production within that market are being materially injured or threatened by material injury*
. . . .

19 U.S.C. § 1677(4)(C) (1988) (emphasis added).

Plaintiffs first contend that the Commission majority erred in its evaluation of whether imports were concentrated in the Southern California region. The Commission majority supported its affirmative find-

ing of "concentration of imports" by stating that:

> [t]here is no precise numerical limit for determining when imports are sufficiently concentrated in the region. The percentage of total Japanese imports to the United States entering Southern California was 67.9 percent in 1986, 70.8 percent in 1987, 73.0 percent in 1988, 73.7 percent in 1989, and 61.2 percent in 1990.... In the circumstances of this industry, and based on the information of record, we conclude that imports from Japan are sufficiently concentrated to warrant consideration of material injury or threat thereof to [the] regional industry.... [Footnote][47] (Commission Report at 20–21, remaining footnotes omitted.)

In footnote 47, the Commission majority noted that the Southern California region was a significant market in the United States as a whole since it accounted for between 8 and 9.8 percent of total United States consumption of cement during the period of investigation. Accordingly, it felt that "consideration of the relative import penetration in the region and in the remainder of the United States" was warranted. Commission Report at 21 n. 47. The Commission majority found:

> [m]arket penetration of Japanese imports in Southern California increased from 4.9 percent in 1986 to 18.2 percent in 1989, before declining in 1990 to 14.7 percent. In the United States as a whole, market penetration of Japanese imports increased from .6 percent in 1986 to 2.4 percent in 1989, before declining in 1990 to 2.2 percent.... Thus, in a market accounting for a significant portion of total U.S. consumption, imports accounted for a much higher share of consumption than in the remainder of the country. While we do not consider this comparison determinative, and would not consider it of much weight if Southern California represented but a very small share of overall U.S. consumption, in the circumstances of this case, it lends further support to our conclusion that im-

ports are sufficiently concentrated.... (Commission Report at 21 n. 47)

Plaintiffs challenge several facets of the Commission majority's affirmative finding of sufficient import concentration. Plaintiffs first contend that pursuant to longstanding precedent, the Commission has required percentages of Japanese imports to the United States entering Southern California to be at least eighty percent before finding a sufficient concentration of imports. Here, the percentage of Japanese imports entering Southern California fell well below this level, and substantial evidence does not support the Commission majority's finding of adequate concentration.

Secondly, plaintiffs point out that in addition to Southern California, imports of Japanese cement were significantly concentrated in three other isolated regions, including Alaska, Hawaii, and the Pacific Northwest. In Alaska, Japanese cement represented 50 percent of consumption, while in Hawaii it was 25 to 40 percent, and in the Pacific Northwest it represented 15 to 21 percent of consumption. The Commission majority cannot bolster its already faulty concentration determination by relying as it did upon the "market penetration" test—the comparison of import market share in the region with import share in the United States generally—because this test was "repudiated" by the Commission in situations where imports were concentrated in other isolated areas rather than dispersed throughout the United States. *See Crushed Limestone from Mexico,* USITC Pub. 2533, Inv. No. 731–TA–562, (Prelim.) (July 1992).

Lastly, plaintiffs argue that if the Commission majority can properly rely upon the market penetration test, it must compare import market penetration in Southern California with market penetration in the other regions where imports were concentrated, instead of in the United States as a whole.

The court finds plaintiffs' arguments unconvincing. While the Commission has generally found percentages higher than 80 percent of total imports to be sufficient[1], it has

---

1. · *E.g., Portland Hydraulic Cement From Australia and Japan,* USITC Pub. 1440, Inv. Nos. 731–TA– 108 and 109 (Final) (Oct.1983); *Offshore Platform Jackets and Piles from the Republic of Korea*

recognized that "because cases before the Commission are likely to involve different factual circumstances, a precise mathematical formula will not always be reliable in determining the minimum percentage which constitutes sufficient concentration." *Certain Steel Wire Nails from the Republic of Korea,* USITC Pub. 1088, Inv. No. 731–TA–26· (Final) (Aug.1980), at 20 (citation omitted).

Further, the Commission has also previously found that percentages substantially less than eighty percent to be sufficient concentrations to warrant a regional analysis. In fact, the Commission specifically noted that "[t]here may be instances in which shipments of less than 50 percent may be considered a concentration of the ... dumped imports within the region." *Certain Steel Wire Nails from the Republic of Korea,* USITC Pub. 1088, Inv. No. 731–TA–26 (Final) (Aug. .1980), at 20. For example, the Commission determined in that case that 43 percent of dumped imports into the region was adequate to establish concentration of imports. In *Fall–Harvested Round White Potatoes from Canada,* USITC Pub. 1463, Inv. No. 731–TA–124 (Final) (Dec.1983), the Commission found that 68 percent of total imports was sufficient.

■ Consequently, the court finds that the Commission majority's determination was supported by substantial evidence that percentages of Japanese imports entering Southern California, such as 67.9 percent in 1986, 70.8 percent in 1987, 73.0 percent in 1988, 73.7 percent in 1989, and 61.2 percent in 1990, constituted sufficient import concentration.

■ Next, the Commission majority also properly employed a market penetration analysis. The legislative history of the Trade Agreements Act of 1979 clearly envisioned utilization of a test of this nature. The Statements of Administrative Action to the Trade Agreements Act of 1979, which was expressly approved by Congress in 19 U.S.C. § 2503(a) (1988), states that "[c]oncentration of ... dumped imports could be found to exist if there is·a clearly higher ratio of such imports to consumption in [the regional] mar-

*and Japan,* USITC Pub. 1848, Inv. No. 701–TA–

ket· than the ratio of such imports to consumption in the remainder of the United States market." H.R.Doc. No. 153, Part II, 96th Cong., 1st Sess. 44 (1979). The Ways & Means Committee of the House of Representatives provided that in a regional analysis, "concentration could be found to exist if the ratio of such imports to consumption is clearly higher in the regional market than in the rest of the U.S. market." H.R.Rep. No. 317, 96th Cong., 1st Sess. 73 (1979). The Senate Finance Committee's report on the 1979 Trade Agreements Act explains that the "requisite concentration will be found to exist in at least those cases where the ratio of the [dumped] imports to consumption of the imports and domestically produced like product is clearly higher in the relevant regional market than in the rest of the U.S. market." S.Rep. No. 249, 96th Cong., 1st Sess. 83 (1979), U.S.Code Cong. & Admin.News 1979, 381, 469.

Moreover, in *Crushed Limestone from Mexico,* USITC Pub. 2533, Inv. No. 731–TA–562, (Prelim.) (July 1992), the Commission reiterated that it maintained "discretion to analyze import concentration" based upon market share. *Id.* at 14.

In their effort to distinguish these precedents, plaintiffs quote qualifying language in *Crushed Limestone from Mexico,* USITC Pub. 2533, Inv. No. 731–TA–562 (Prelim.) (July 1992) which provides that application of the market share theory was .unwarranted because imports in that case were overwhelmingly limited to a ten state region and not "dispersed widely throughout the country." *Id.* at 14. ·

Plaintiffs' argument, however, not only ignores the relevant legislative history, it ·overlooks the express explanation of the Commission majority that under the circumstances of the instant case, *sole* reliance upon the market penetration theory would be inappropriate and not "determinative." The Commission majority's finding of concentration rested primarily upon the fact that a sufficient percentage of imports were concentrated in Southern California. The market penetration analysis only lent "further support

248 (Final) (May 1986).

to our conclusion that imports are sufficiently concentrated...." Commission Report at 21 n. 47. Plaintiffs were wholly unable to demonstrate that the Commission majority's secondary consideration of the market penetration test was not supported by substantial evidence or in accordance with law.

Similarly, plaintiffs failed to provide any legal, legislative, or factual support for their last argument that the court should disregard long settled Commission practice and specific legislative history and require the Commission to contrast the penetration of Japanese imports into Southern California with the market share of the imports in other specific regions, such as Alaska, Hawaii, or the Pacific Northwest.

Consequently, the court finds that substantial evidence supports the Commission majority's determination that imports of Japanese cement were sufficiently concentrated in Southern California.

### III. Injury to the Regional Industry

Plaintiffs also assert that the Commission majority erred by finding the Southern California region was materially injured. Title 19 of United States Code, Section 1677(4)(C) (1988) provides that the Commission may find material injury in a regional analysis when "the producers of all, or almost all, of the production within that [regional] market are being materially injured or threatened by material injury...."

In interpreting the "all, or almost all" standard, the court in *Cemex, S.A. v. United States*, 16 CIT ——, 790 F.Supp. 290 (1992), *aff'd*, 989 F.2d 1202 (Fed.Cir.1993), held that the Commission did not err in failing to apply a fixed percentage test of eighty to eighty-five percent when evaluating whether imports of Mexican cement were dumped into the region of the southern-tier states of California, Texas, Arizona, New Mexico, Alabama, Louisiana, Mississippi, and Florida. The court stated that "there is nothing in the statute, case law, or administrative practice to indicate Congressional intent to bind [the Commission] to a precise numerical percentage." Rather, these determinations are "to be made on a case-by-case basis." *Id.* 790 F.Supp. at 294.

Plaintiffs claim that in this case, the all, or almost all standard must be strictly enforced to require a significant percentage, such as 80 to 85 percent, and this criterion was not met here. Plaintiffs argue that, contrary to the facts in *Cemex*, 790 F.Supp. at 290, Southern California represented a small proportion of total United States production. Unless the Commission majority finds that a high percentage of the relevant industry was injured, nationwide duties would be imposed even though only a small portion of United States production was actually injured. Moreover, substantial evidence in the record does not support a finding of injury to a significant percentage of the industry since the regional industry "as a whole was performing well" and [ ] demonstrated no injury and aggregated data showed the overall good health of the industry. Plaintiffs' Memorandum of Points and Authorities in Support of Rule 56.1 Motion for Judgment on the Agency Record ("Plaintiffs' Memorandum") at 22.

Further, plaintiffs contend that the Commission majority primarily relied upon an aggregate methodology, and failed to use a pure "plant-by-plant" analysis when determining whether a sufficient percentage of individual plants in Southern California suffered injury. In addition, the Commission majority's cursory explanation that plant-by-plant information substantiated aggregate findings was not supported by substantial evidence. Finally, plaintiffs conclude that the Commission majority's determination contained internal contradictions, and failed to fully explain certain findings.

█ The court notes from the outset that "[a]s long as the agency's methodology and procedures are reasonable means of effectuating the statutory purpose, and there is substantial evidence in the record supporting the agency's conclusions, the court will not ... question the agency's methodology." *Ceramica Regiomontana, S.A. v. United States*, 10 CIT 399, 404–405, 636 F.Supp. 961 (1986) *aff'd*, 5 Fed.Cir. (T) 77, 810 F.2d 1137 (1987). Consequently, the court must evaluate whether the findings that a sufficient percentage of the regional industry suffered

injury and whether the methodology chosen by the Commission majority were reasonable and supported by substantial evidence.

■ In regard to the first issue, the court notes that the Commission is not required to find that a fixed percentage of the regional industry was injured. *See Cemex,* 790 F.Supp. at 290. The Commission is not limited to a precise numerical percentage; instead, determinations of this nature are "to be made on a case-by-case basis." *Id.* at 294.

■ In the case at bar, substantial evidence shows that as a whole, the regional industry did evince injury. Commission Report at 24–29. For example, regional capacity to produce cement and clinker "demonstrated an inverse relationship to production level during 1986–1990, falling 1 percent and 9 percent respectively." Commission Report at 24, Staff Report at A–23 and Table 7. In an industry where inventories were not maintained, inventories of cement rose by 69 percent, and employment within the industry declined. Moreover, "[d]espite increases in the domestic industry's operating income, the industry has suffered significant declines in market share. Further, domestic prices have declined notwithstanding increased demand over much of the period of investigation." Commission Report at 29 (footnote omitted).[2]

Substantial evidence also demonstrates that [ ] despite plaintiffs' argument that [ ] "[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Federal Maritime Commission,* 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966). Evidence in the record shows that

[ . ] Confidential Document No. 19, Exhibit 22 at 10–11. *See also* Confidential Document No. 19, Exhibits 20, 36, 37; Public Document 183, Testimony of William McCormick and Charles L. May.

Accordingly, the court finds the Commission majority's determination that all, or almost all of the regional domestic industry suffered injury was supported by substantial evidence.

The court must next address plaintiffs' argument that the Commission majority's methodology for evaluating injury to Southern California was unreasonable and not supported by substantial evidence.

■ In a regional analysis, the Commission may evaluate injury through utilization of an "aggregate" method in which the Commission evaluates industry averages, or it may use a "plant-by-plant" analysis. In this method, the Commission examines injury indicators on a plant-by-plant basis and then determines whether individual companies exhibiting injury compromise all, or almost all of production.

In explaining its methodology for finding injury, the Commission majority stated that while an analysis of the aggregate information indicated injury, it also considered:

> the information on industry performance on a plant-by-plant basis in the record. We note that, in most cases, the company specific information did not reveal any significantly different performance than did the industry information as a whole. Commission Report at 24 (footnote omitted).

The Commission majority concluded that:

> The fungible character of cement, and the localized nature of competition in the Southern California market, support our conclusion that no producer is shielded from the injury to the industry reflected by these trends. Our consideration of the plant-specific information on the record bears out this observation, as does our consideration of various data presented in the "percentage of production" aggregates. *Id.* at 29.

In *Cemex,* 790 F.Supp. at 290, the most definitive case in this area, the court provided that "although a pure producer-by-producer analysis is not required by statute,

---

2. Plaintiffs also assert that [ ] the petition. Therefore, they contend, this comprises further evidence that all, or almost all of the domestic regional industry was not injured. Plaintiffs' theory fails to recognize that [ ]. Further, [ ] does not, ipso facto, signify that the producer was not injured.

examination of individual plant information can highlight anomalies that an aggregate analysis would disguise." *Id.* at 295.

Plaintiffs contend that this action was best suited for a pure plant-by-plant investigation. Unlike the facts in *Cemex* where over 40 producers existed, only seven plants operated in Southern California. Consequently, they argue, each individual plant had a greater impact on the average and [ ] was not injured.

 The court finds that the Commission majority was not required to adopt the pure plant-by-plant inquiry as plaintiffs would like. Use of either a straight aggregate or pure plant-by-plant method in determining injury in a regional analysis is not mandated by statute or case law. *See Cemex*, 790 F.Supp. at 290. Further, in the only case in which this court required a producer-by-producer analysis, *Atlantic Sugar, Ltd. v. United States*, 2 CIT 295 (1981), the Federal Circuit noted in dicta on appeal in the related action of *Atlantic Sugar, Ltd. v. United States*, 6 CIT 190, 573 F.Supp. 1142 (1983) that the statute did not require a plant-by-plant inquiry. *Atlantic Sugar, Ltd. v. United States*, 2 Fed.Cir. (T) 130, 744 F.2d 1556 (1984).

 The court, nevertheless, recognizes that in certain actions analysis of company specific data is vital because it can "highlight anomalies that an aggregate analysis would disguise." *Cemex*, 790 F.Supp. at 290, 295. The court finds that the case at bar is just such an action, especially in light of the fact that only a limited number of plants are involved. Accordingly, the court must next determine whether the Commission majority sufficiently reviewed plant-by-plant information.

The Commission majority's discussion of specific plant-by-plant data was sparse because it found that "[c]ompany specific information is confidential, and is therefore not specifically discussed." Commission Report at 24 n. 53. The Commission majority explained that it "carefully considered" plant-by-plant information and that it did not "re-

veal any significantly different performance" than the industry viewed in total. *Id.* at 24. Further, "[t]he company specific information varies in the extent of increases and declines in various operating performance indicators during the period of investigation, but shows largely the same overall trends.... We also have considered data on the number of plants reporting annual decreases in various financial indicators during the period of investigation." *Id.* at 27 n. 77. It concluded that "[o]ur consideration of the plant-specific information on the record" supported its observation that "no producer is shielded from the injury to the industry...." *Id.* at 29.

While the Commission majority is presumed to have considered all evidence in the record, and company specific information was available to the Commission, the Commission majority discussed the plant-by-plant information in only very general terms. Although it is apparent that the Commission majority did examine plant-by-plant information, the court cannot review whether the Commission majority's conclusion that the data itself substantiated the aggregate methodology's indications of injury because the Commission revealed so little of its reasoning. Therefore, the court remands this portion of the determination to the Commission so that it may provide further explanation of its decision. If the Commission finds itself constrained by the confidential nature of company specific information, it should issue a confidential determination.

Plaintiffs next assert that the Commission majority's determination was internally contradictory. They claim that the Commission majority "characterized a decline of 1.5 percentage points in industry average operating margins between 1989 and 1990 as '*significant*,' when concluding that the regional industry as a whole was suffering material injury. The [Commission majority] also stated that company-specific information did not reveal any '*significantly* different performance than did the industry information as a whole.'"[3] Plaintiffs' Memorandum at 29 (emphasis added) (footnotes omitted).

---

3. As discussed previously, the Commission majority stated that, "in most cases, the company specific information did not reveal any significantly different performance than did the indus-

Plaintiffs argue that in point of fact, averages of operating profit margins for individual producers varied far more than [ ] from industry averages. Therefore, the Commission majority's statement that "significantly" disparate plant-by-plant information "significantly" supported aggregate findings was contradictory and not supported by substantial evidence.

The court notes as a prefatory matter that the Commission majority determined that declines in *operating income*, rather than *operating income margins*, were "significant". However, as discussed previously, the court cannot determine at this juncture whether the Commission majority's general conclusion was supported by substantial evidence that *in most cases* company specific information failed to reveal significant differences in performance . than did industry aggregate data. Therefore, the court cannot evaluate whether the Commission majority's determination was internally inconsistent, and reserves judgment on this issue until after determination by the Commission majority upon remand.

Lastly, plaintiffs assert that the Commission majority failed to explain its final conclusion that "various data presented in the 'percentage of production' aggregates" confirmed the observation that all, or almost all of the regional industry suffered injury. Commission Report at 29.

■ However, the Commission is not required to discuss all information upon which it relied in making its determination, especially where, as in this case, the agency's path may be reasonably discerned from the determination. *Negev Phosphates, Ltd. v. U.S. Department of Commerce*, 12 CIT 1074, 1083, 699 F.Supp. 938 (1988); *Roses Inc. v. United States*, 13 CIT 662, 668, 720 F.Supp. 180, 185 (1989).

In conclusion, the court determines that the Commission majority's finding that all, almost all of the regional domestic industry suffered material injury was, in part, supported by substantial evidence and in accordance with law. The court also remands the

try information as a whole." Commission Re-

case, in part, to the Commission for further explanation.

### IV. Cumulation of Mexican with Japanese Imports

Plaintiffs next challenge the Commission majority's cumulation of imports of cement from Mexico with imports from Japan for purposes of assessing material injury.

Title 19 of United States Code, Section 1677(7)(B) (1988) provides that in connection with its material injury investigation, the Commission shall consider, among other factors, the volume of imports and the effect of the imported merchandise on prices in the United States for like products. Subsection (iv) of Title 19 United States Code Section 1677(7)(C) (Supp. III 1991) further specifies that when evaluating volume and price effects:

> the Commission shall cumulatively assess the volume and effect of imports from two or more countries of like products subject to investigation if such imports compete with each other and with like products of the domestic industry in the United States market.

The seminal case in this area, *Chaparral Steel Co. v. United States*, 8 Fed.Cir. (T) ——, ——, 901 F.2d 1097, 1101 (1990), specified that "[t]o include imports in the cumulation equation, the statute requires they be 'subject to investigation,' 'compete' with like products, and implies that they be marketed 'reasonably coincident' in time . . . ."

Plaintiffs challenge the Commission majority's cumulation of imports from Mexico with Japanese imports on grounds that Mexican imports were not subject to investigation, the Mexican investigation concerned a different regional industry than the present action, and finally that Mexican imports must also be cumulated when determining whether imports were sufficiently concentrated in Southern California. Because the court determines that substantial evidence does not support the Commission majority's determination that imports of Mexican cement were subject to investigation, plaintiffs' remaining

port at 24.

challenges to cumulation need not be addressed by the court.

Plaintiffs rest their assertion that Mexican imports of cement were not properly subject to investigation upon *Chaparral Steel Co. v. United States*, 901 F.2d at 1097, and *Chr. Bjelland Seafoods A/C (Now Norwegian Salmon A/S) v. United States*, No. 92–196, 1992 WL 317538 (CIT October 23, 1992), *appeal docketed*, No. 93–1235 (Fed.Cir. Mar. 4, 1993) (*"Norwegian Salmon"*). They argue that the Federal Circuit and this court abrogated the grounds upon which the Commission majority found that Mexican imports were subject to investigation.

In *Chaparral*, the Federal Circuit reversed the Court of International Trade and confirmed the Commission's 1985 refusal to cumulate unfairly traded imports of steel from Spain and South Africa subject to countervailing duty orders issued in 1982 and 1983, with Norwegian steel imports under investigation. In addition to explaining the three preliminary factors that cumulable imports must be subject to investigation, in competition with like products, and marketed reasonably concurrently, the court defined the provision "subject to investigation." The Commission interpreted this factor to include only those imports under investigation on the day the Commission made its final injury determination ("vote day"), those imports proven to be unfairly traded, and those with continuing impact as of vote day. Additionally, imports subject to investigation must cause present material injury.

However, the Federal Circuit in *Chaparral*, 901 F.2d at 1097, actually upheld the Commission's refusal to cumulate unfairly traded Spanish and South African imports which entered prior to 1983, on the grounds the imports did not *"contemporaneously*

*compete* with the Norwegian imports" under investigation. *Id.* at 1105 (emphasis added).

In *Norwegian Salmon*, an action which did not involve cumulation, the court reiterated that the Commission must determine whether imports caused present material injury to the domestic industry. In that case, the court reversed the Commission's finding that negative lingering effects from an injury caused by the presence of imported Norwegian salmon in mid–1988 to 1989 comprised present material injury in 1991.

In the case at bar, imports of Mexican cement were subject to a final antidumping duty order published August 30, 1990. *Gray Portland Cement and Clinker from Mexico*, 55 Fed.Reg. 35,443 (Dep't Comm.1990) (Antidumping Duty Order). In the instant case, the Commission majority voted several months later on April 23, 1991 to cumulate imports of Mexican cement which entered the United States prior to August 30, 1990 with the subject Japanese imports. In order to satisfy the requirement that Mexican imports still be subject to investigation on vote day, the Commission relied upon its longstanding "recent order exception." Under the exception, Commission precedent provides that imports subject to a very recent order may continue to contribute an injury to the domestic industry, and are therefore properly cumulable.

Plaintiffs contend that the combined holdings in *Chaparral* and *Norwegian Salmon* provide that lingering effects of previous unfairly traded imports cannot comprise present material injury. Plaintiffs argue that therefore imports entering prior to a recent order cannot as a matter of law cause *present* material injury on vote day. In essence, *Chaparral* and *Norwegian Salmon* implicitly overrule the recent order exception.[4]

---

4. Plaintiffs also cite to *United Engineering and Forging v. United States*, 15 CIT ——, 779 F.Supp. 1375 (1991) as support for the proposition that *Chaparral* abrogated the recent order exception. However, *United Engineering*, which concerned significantly different facts and issues than in either *Chaparral* or the case at bar, simply listed **in dicta** in connection with its discussion of an unrelated matter that: *"Cf. Chaparral Steel Company v. United States*, 901 F.2d 1097, 1105 (Fed. Cir.1990) (imports no longer subject to a pending

investigation not subject to cumulation)." *Id.* 779 F.Supp. at 1393. *United Engineering* did not address the facts underlying *Chaparral*, or the actual legal basis upon which the Commission and the Federal Circuit reached their determinations. Neither did it consider the recent order exception. This court finds the brief reference in *United Engineering* to the professed holding of *Chaparral* to be of little probative weight in the present context.

The court is not persuaded by plaintiffs expanded reading of *Chaparral* and *Norwegian Salmon*. It is clear that on its face *Chaparral* did not reject the recent order exception. Instead, the court affirmed the Commission's refusal to cumulate Spanish and South African imports because they failed to *compete contemporaneously* with Norwegian imports. The Commission's determination did not reject cumulation on the grounds that the imports were no longer subject to investigation.

Moreover, while the *Chaparral* court did not directly examine the recent order exception, it recognized that, in fact, merchandise imported prior to a antidumping or countervailing duty order may cause present material injury on vote day. Specifically, when concluding that the Commission may as a policy reasonably evaluate candidates for cumulation based upon effects of unfair trading as of vote day, the court observed that in that case, the record was devoid of facts "to prove residual effects [on vote day] of unfairly traded imports that [entered prior to an antidumping or countervailing order, and which] cause present injury to the domestic industry. We therefore need not determine whether any such effects have dissipated." *Chaparral*, 901 F.2d at 1105 n. 8.

Similarly, in *Norwegian Salmon*, this court found that lingering effects of a previous *injury* cannot comprise present material injury. It did not determine that earlier imports cannot ever cause present injury on vote day. *See* No. 92–196 (CIT October 23, 1992).

The Commission itself has also recently permitted cumulation of imports subject to a recent order because the merchandise continued to cause present material injury. In *Industrial Nitrocellulose from Yugoslavia*, USITC Pub. 2324, Inv. No. 731–TA–445 (Final) (Oct. 1990), the Commission justified its decision to cumulate imports by stating that:

unfair imports [which] entered prior to imposition of duties are still present in the marketplace and may still impact the domestic industry. The length of time of this continuing impact may vary from case to case depending upon such factors as the nature of the distribution system and the

size of existing inventories.... For this reason, the Commission cumulates imports subject to an outstanding antidumping or [countervailing duty] order when that order is recent. *Id.* at 6–7.

The court finds, therefore, that based upon the record in this action, relevant case law, and administrative precedent, imports entering the United States prior to an order are not prohibited as a matter of principle from causing present injury. The issues of whether imports subject to a recent order produce present injury to a industry, or whether the impact from those imports improperly reflected a previous injury with lingering effects are fact-based determinations which the Commission and the courts must address on a case-by-case basis. Accordingly, the court must evaluate whether substantial evidence supports the Commission majority's determination that imports of cement from Mexico contributed to present injury.

In support of its finding that imports of Mexican cement caused present injury, the Commission majority explained only that:

The imports from Mexico which enter Southern California compete with the subject imports from Japan and the domestic like product. As the Commission has frequently noted, cement is a fungible commodity, which competes largely on the basis of price. Imports from Mexico and Japan have been simultaneously present in the California market during the period of investigation. Imports from Mexico and Japan share common or similar channels of distribution, being imported through bulk import terminals and distributed throughout the region in the same manner. Commission Report at 30–31 (footnote omitted).

The court finds it important to emphasize that an agency "must make findings that support its decision, and those findings must be supported by substantial evidence." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962). The agency must articulate a rational connection between the facts found and the choice made. *Id.* at 168, 83 S.Ct. at 245. Any determination that

cumulation is appropriate must therefore contain findings that imports from the candidate for cumulation were "definitely determined ... to *contribute to present material injury.*" *Chaparral,* 901 F.2d at 1097, 1104 (emphasis added).

■■■ The Commission majority's explanation in its determination failed to include any discussion or evidence whatsoever showing that imports of cement from Mexico prior to the August 30, 1990 order caused *present* material injury to the domestic industry on its April 23, 1991 vote day. As aptly noted by plaintiffs, neither present competitive market conditions nor inventory levels of Mexican imports were examined or discussed.

Defendants assert that inventory levels are irrelevant to a finding of present injury because the Commission majority recognized that "inventories are not a significant factor in the cement industry." Defendants' Memorandum in Opposition to Plaintiffs' Motion for Judgment on the Agency Record (Defendants' Memorandum") at 52 n. 65. However, the evidence shows that on vote day, inventory levels of Mexican cement were very low. *See* Commission Report at 77 n. 26. As noted by Commissioner Brunsdale:

> [t]his provides compelling evidence that any cement imported into the United States prior to the entry of the final order in the Mexican Cement case would have been sold well before the conclusion of the present investigation. Thus, any Mexican cement currently being sold in the United States is fairly traded and should not be cumulated with Japanese cement in determining injury in the present case. Commission Report at 77 n. 26.

Moreover, an independent review of the record demonstrates only the historical position which Mexican cement held in the market. For example, the evidence shows that the domestic industry lost market share despite surging demand for cement from 1986 through 1989, and the effects of this lost market share had a significant adverse impact on the condition of the industry over the long run. Commission Record at 28, 29. At best, this evidence demonstrates a past injury caused by imports of Mexican cement.

Not only is evidence of this nature clearly inadequate to show present material injury, but it runs counter to one of the overriding principles behind United States unfair trade laws, namely that antidumping and countervailing duties serve a remedial purpose. *Chaparral,* 901 F.2d at 1097, 1103.

In summary, the court holds that no evidence in the Commission majority's determination supports the finding that Mexican imports caused present material injury. The Commission majority's determination to cumulate imports of cement from Japan with imports of Mexican cement was therefore not supported by substantial evidence, and must be reversed.

■■■ Lastly, defendants argue that even should the court determine that cumulation was assessed improperly, the Commission specifically found that imports of unfairly traded Japanese cement alone caused injury and it would have "rendered an affirmative determination even had we not cumulated Mexican imports." Commission Report at 36 n. 93.

In its determination, the Commission majority based this conclusion upon the generalizations that Japanese imports increased steadily until 1990, and the "record shows substantial underselling by the Japanese imports, which we believe has led to the suppression and depression of prices for the domestic like product." Commission Report at 36 n. 93.

However, as noted previously, an agency must make findings supporting its decision which are supported by substantial evidence. Further, a rational connection must exist between the facts found and the choice made. *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962). The handful of broad statements made by the Commission majority do not begin to satisfy the criteria that the Commission's injury determination must be supported by rationally-based findings.

Accordingly, the court finds that substantial evidence does not support the Commission majority's conclusion that sales of Japanese cement caused material injury material

to the regional industry even when viewed independently of Mexican cement. The court therefore remands this action to the Commission. Upon remand, the Commission is directed to determine whether imports from Japan caused material injury without cumulation of Mexican imports in its analysis, and to provide a full and complete explanation of its subsequent decision.

## V. Causation based on Underselling and Price Effects

Title 19 United States Code, Section 1677(7)(B) (1988) provides that when making its material injury determination, the Commission shall consider:

(I) the volume of imports of the merchandise which is the subject of the investigation,

(II) the effect of imports of that merchandise on prices in the United States for like products, and

(III) the impact of imports of such merchandise on domestic producers of like products, but only in the context of production operations within the United States;

. . . .

Title 19 U.S.C. § 1677(7)(C)(ii) (1988) specifies that in evaluating the second factor of price effects, the Commission shall consider whether:

(I) there has been significant price underselling by the imported merchandise as compared with the price of like products of the United States, and

(II) the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree.

Plaintiffs challenge only three aspects of the Commission majority's price effects analysis. As a background to their first objection, plaintiffs explain that the Commission majority divided Southern California into four market areas, namely Los Angeles, Orange County, Riverside County, and San Diego.[5] The Commission majority found

that weighted average prices in each area declined over the period of investigation, before increasing during the last nine months of 1990. The Commission majority also determined that Japanese prices were mixed during this period, but also generally declined. Accordingly, the Commission majority concluded that "both price depression and price suppression may have occurred. . . ." Plaintiffs' Memorandum at 46, quoting Commission Report at 39.

In their first challenge, plaintiffs argue that the Commission majority inexplicably varied from its "traditional" test for determining whether price suppression or depression was present. Pursuant to a "traditional" analysis, the Commission examines cost trends within the domestic industry, in that changes in net sale prices are compared with changes in costs. Had the Commission majority performed this evaluation, the evidence would have shown that prices declined because the cost of goods sold [ ] since 1986.

The court notes initially that the statutory scheme is silent regarding the weight, if any, which the Commission should assign to cost trends in its price effects analysis. Further, contrary to plaintiffs' position, the Commission's does not appear to maintain a "traditional" test for determining price suppression or depression. In the past, the Commission has calculated price effects without examining trends in costs. *See Certain Steel Pails from Mexico*, USITC Pub. 2205, Inv. No. 731–TA–435 (Prelim.) (July 1989); *Chrome–Plated Lug Nuts from the People's Republic of China and Taiwan*, USITC Pub. 2427, Inv. Nos. 731–TA–474–475 (Final) (Sept. 1991); *Certain Gene Amplification Thermal Cyclers and Subassemblies Thereof from the United Kingdom*, USITC Pub. 2412, Inv. No. 731–TA–485 (Final) (Aug. 1991). The Commission has also investigated price effects with consideration given to cost trends. *See Minivans from Japan*, USITC Pub. 2402, Inv. No. 731–TA–522 (Prelim.) (July 1991); *Ball Bearings, Mounted or Unmounted, and Parts Thereof, from Argentina, Austria,*

---

5. The Commission also obtained price information from the San Francisco area in Northern California.

*Brazil, Canada, Hong Kong, Hungary, Mexico, the People's Republic of China, Poland, the Republic of Korea, Spain, Taiwan, Turkey and Yugoslavia,* USITC Pub. 2374, Inv. No. 701–TA–307 (Prelim.) (Apr. 1991).

■ Because the statute is not clear on its face and Commission precedent is not definitive, the court must determine whether in this case the Commission majority's exclusion of cost trends from its price effects analysis was reasonable and permissible. *See Chevron U.S.A. Inc. v. National Resources Defense Council Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). The court recognizes that Congress provided the Commission with broad discretion in analyzing and assessing the significance of the evidence on price undercutting. *Copperweld Corp. v. United States,* 12 CIT 148, 682 F.Supp. 552 (1988). However, the Commission's determination must still be reasonable and supported by the record as a whole. *Atlantic Sugar, Ltd. v. United States,* 2 Fed.Cir. (T) 130, 136, 744 F.2d 1556 (1984).

While the record contained evidence of underselling by the imports under investigation and decreasing transaction prices in the context of increased demand and capacity utilization, significant evidence also demonstrated that costs declined during the subject period. (Commission Report at 43, Staff Report at A–37, and Table 15.) In fact, the Commission majority itself acknowledged that declines in costs contributed to increased operating income margins within the industry. (Commission Report at 43.) However, despite this evidence, the Commission majority failed to discuss the impact of these cost trends on prices in the industry, and did not examine whether such declining costs, rather than the unfairly traded imports, materially caused decreasing prices.

■ The court emphasizes that while unfairly traded imports may have actually caused price depression or suppression in this case, the Commission cannot simply ignore significant contradictory evidence and assert that, nevertheless, its determination was supported by substantial evidence. "The [Commission] is obligated to weigh all the pertinent evidence gathered in an investiga-

tion in reaching a determination." *Roses, Inc. v. United States,* 13 CIT 662, 665, 720 F.Supp. 180 (1989). An agency must " 'disclose the basis of its order' and 'give clear indication that it has exercised the discretion with which Congress has empowered it.' " *Burlington Truck Lines v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962) (quoting *Phelps Dodge Corp. v. Labor Board,* 313 U.S. 177, 197, 61 S.Ct. 845, 854, 85 L.Ed. 1271 (1941)).

■ The court determines, therefore, that in this case, the Commission could not reasonably evaluate the effect of the subject imports on prices in the United States by overlooking the impact, if any, of declining costs within the domestic industry. The court therefore remands this determination to the Commission. Upon remand, the Commission is instructed to explain the impact of these cost trends upon prices. Based upon that finding, the Commission is directed to re-evaluate whether unfairly traded imports caused depression or suppression within the industry, and whether the domestic industry was injured by reason of unfairly traded Japanese imports.

■ Next, in their second challenge, plaintiffs assert that "the record here and past precedent" shows that the four market areas into which the Commission majority divided Southern California were too broad to allow "any meaningful price comparisons to be made for cement, a product whose high transportation costs create significant differences in competitive conditions between areas only a few miles apart." Plaintiffs' Memorandum at 48, 49 (footnote omitted).

Plaintiffs base their objection upon a single 1983 Commission determination, *Portland Hydraulic Cement from Australia and Japan,* USITC Pub. 1440, Inv. Nos. 731–TA– 108 and 109 (Final) (Oct. 1983), *aff'd, Gifford–Hill Cement Co. v. United States,* 9 CIT 357, 615 F.Supp. 577 (1985). In that case, the Commission collected pricing data from approximately 70 transportation, or delivery, zones within Southern California.

■ The court notes that the Commission is not statutorily bound to undertake a par-

ticular pricing analysis, and "[i]n the absence of a statutory requirement, the Commission's discretionary election not to conduct [a specific] analysis does not render its determination contrary to law." *Negev Phosphates, Ltd. v. U.S. Department of Commerce*, 12 CIT 1074, 1091, 699 F.Supp. 938 (1988). In all actions subsequent to *Portland Hydraulic Cement from Australia and Japan* that involved unfairly traded cement or cement clinker, the Commission obtained pricing information from major markets, rather than subzones. *See Gray Portland Cement and Cement Clinker from Venezuela*, USITC Pub. 2400, Inv. Nos. 303–TA–21, 731–TA–519 (Prelim.) (July 1991); *Gray Portland Cement and Cement Clinker from Mexico*, USITC Pub. 2305, Inv. No. 731–TA–451 (Final) (Aug. 1990); *Portland Hydraulic Cement and Cement Clinker from Columbia, France, Greece, Japan, Mexico, the Republic of Korea, Spain, and Venezuela*, USITC Pub. 1925, Inv. Nos. 731–TA–356–363 (Prelim.) (Dec. 1986).

Moreover, plaintiffs failed to point to any actual evidence in the record which demonstrates that use of a major market analysis adversely influenced price comparisons. For example, while plaintiffs' posited that subzones were appropriate because the Commission majority commented generally that the sample used "may not completely accurately represent pricing patterns in the Southern California market," a review of the record shows that the Commission majority's statement was unrelated to a determination of whether a subzone analysis was more appropriate. Commission Report at 40. It simply prefaced the Commission majority's finding that, nevertheless, consistent underselling along with domestic price reduction prompted by lower priced imports demonstrated the significant adverse effect which imports had in the market. Commission Report at 41.

Accordingly, the court finds that the Commission majority's determination to collect information from four market areas in Southern California was supported by substantial evidence.

In their last objection to the Commission majority's evaluation of price effects, plaintiffs contend the. Commission majority improperly excluded consideration of the vast majority of imports into the regions because they were sold in related party transactions. As a result, price comparisons were made upon a limited data base, which accentuated the bias already present in the price sample.

However, the record demonstrates that cement transferred between [ ] Confidential Document No. 18 at 54. Plaintiffs failed to show that exclusion of these transactions was improper, or how it biased the Commission majority's determination. Indeed, the Commission majority noted to the contrary that. exclusion of related party sales prices eliminated "one of the elements which might skew the information." Commission Report at 40 n. 111.

Consequently, the court finds that the Commission majority's analysis of price effects was, in part, supported by substantial evidence. Further, the Commission majority's determination is, in part, remanded to the Commission.

## VI. Commissioner Rohr's Threat of Injury Finding

Plaintiffs next assert that the Commission majority's determination that the relevant domestic industry was threatened with material injury was not supported by substantial evidence.

Title 19 United States Code 1677(7)(F)(ii) (1988) provides in this regard that:

Any determination by the Commission ... that an industry in the United States is threatened with material injury shall be made on the basis of evidence that the threat of material injury is real and that actual injury is imminent. Such a determination may not be made on the basis of mere conjecture or supposition.

After an analysis of the evidence presented to the Commission, Commissioner Rohr determined that the regional industry was sufficiently threatened with material injury. Plaintiffs now claim that this determination was not sufficiently supported. In particular, plaintiffs argue that Commissioner's Rohr's threat determination was based upon four simple, but inaccurate findings, namely

that the Southern California region was vulnerable to increased imports, excess Japanese production capacity existed, import terminals served the region, and that underselling by Japanese imports occurred.[6] Plaintiffs' Memorandum at 52.

It bears repeating that the responsibility of the court is to determine whether the Commissioner's determination was supported by substantial evidence. 19 U.S.C. 1516a(b)(1)(B) (1988). The court's function is not to decide whether it would have made another decision on the basis of the evidence. *Matsushita Elec. Indus. Co. v. United States,* 3 Fed.Cir. (T) 44, 54, 750 F.2d 927 (1984). The agency's finding may well be supported by substantial evidence even though the possibility of drawing two inconsistent conclusions from the evidence exists. *Consolo v. Federal Maritime Commission,* 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966).

In this case, a review of the record demonstrates that Commissioner Rohr's determination was neither limited to the narrow grounds outlined by plaintiffs, nor was it unsupported as a whole by substantial evidence. In point of fact, Commissioner Rohr found that the regional industry was threatened with material injury because of its vulnerability to injury by dumped imports, the existence of excess Japanese cement production capacity, a rapid increase in volume of imports and import penetration into the region, underselling by Japanese imports along with its negative effect on prices, and Japanese investment in import terminals. Commission Report at 50–65.

The court will, however, address plaintiffs' specific assertions that certain of these findings were not based upon substantial evidence. Plaintiffs' first contention was the sweeping generalization that Southern California was not "vulnerable" because: "the [ . ] and the [ ]. Even the industry aggregate data indicated a healthy regional industry." Plaintiffs' Memorandum at 52.

A review of the entire record shows that notwithstanding plaintiffs' contentions, the evidence supports Commissioner Rohr's determination of industry vulnerability. Commissioner Rohr himself noted that a downward trend in the "actual performance of producers and in the percentage of producers operating at levels that I conclude are not indicative of injury" showed "serious vulnerability" to potential effect of unfairly traded imports. Commission Report at 61. Commissioner Rohr also referenced the evidence that fewer producers existed and "smaller percentages of regional production [were] accounted for by producers operating at high levels. . . ." Commission Report at 61. Further, the industry was unable to increase its capacity. Commission Report at 61. Evidence also supported Commissioner Rohr's finding that a major reason for the financial present performance of the industry was its ability to reduce costs, but that the "potential for further significant cost reductions" appeared limited. Commission Report at 61. Moreover, contrary to plaintiffs' contentions, as discussed previously in § III of this opinion, evidence supports the finding that [ ] did indeed [ ].

The court notes that plaintiffs failed to discredit or undermine any of the evidence supporting Commissioner Rohr's finding of industry vulnerability. The court concludes that this aspect of the Commissioner's determination was supported by substantial evidence.

Next, plaintiffs assert that Commissioner Rohr's analysis of existing Japanese production capacity was filled with speculation. Plaintiffs contend that Japanese production capacity **utilization** alone increased, rather than its production capacity. During this period, Japan began modernizing its kilns and kilns were removed from operation, which caused capacity to decrease and capacity utilization to increase. Additionally, plaintiffs argue that an expanding Japanese home market absorbed all available cement production. Plaintiffs conclude that even assuming actual production increased in Japan,

---

**6.** Plaintiffs do not object to any other aspect of Commissioner Rohr's finding of underselling than those challenged in connection with the Commission majority's determination. Because the court previously addressed these arguments under § V, *supra,* they need not be revisited here.

Commissioner Rohr simply speculated that excess production would be exported to the United States.

However, plaintiffs' arguments miss the point of Commissioner Rohr's reliance upon evidence of Japanese production capacity. The Commissioner found that cement capacity utilization was important because it "remained only at 90 percent, *below* that which would appear optimal for cement producers. In addition, this 10 percent unused capacity represents an amount of cement equal to or exceeding the entire apparent consumption of cement in Southern California." Commission Report at 62 (footnote omitted, emphasis added). Plaintiffs also failed to point to any evidence contradicting the Commissioner's reliance upon indications that the Japanese home market might not absorb this excess capacity. *See* Confidential Document No. 19 at 108–110, Exhibits 67, 68, 69.

██ Plaintiffs were also unable to discredit Commissioner Rohr's findings that imports increased from 1986 until Commerce's suspension of liquidation in 1990 [7], as did import penetration. Plaintiffs did not undermine Commission Rohr's conclusion that even in the absence of any further increases, present levels were likely to be injurious in the future. Commission Report at 63–64.

The court finds that Commissioner Rohr's examination of Japanese excess cement production capacity was in accordance with law.

Finally, plaintiffs challenge as speculative Commissioner Rohr's determination that Japanese investment in import terminals with large throughput capacity was an adverse trend that indicated threatened, actual injury.[8] *See* Commission Report at 64–65. Plaintiffs contend that since the Japanese investors also owned the [ ] in Southern California, their interests were "similar" to petitioners. It would be economically unwise to "source cement from their import

terminals because doing so would jeopardize optimal returns on their domestic production investments." Plaintiffs' Memorandum at 57 (footnote omitted).

Plaintiffs also argue that because one terminal was under construction during the period of investigation and would not receive cement until late 1991, no evidence showed that it presented an "imminent" threat. Moreover, the remaining terminals did not maintain any [ ], and imports of Japanese cement declined in 1990.

However, the court notes again that it must determine whether substantial evidence supports the Commission's determination, even though inconsistent conclusions may be drawn from the evidence. *Consolo v. Federal Maritime Commission,* 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966). The evidence shows that Japanese exporters acquired or invested in import terminals and ready-mix concrete producers in Southern California.[9] Based upon this evidence, the court finds that Commissioner Rohr's finding that "[s]uch investments would be extremely uneconomical unless used, and it is reasonable to believe that Japanese cement could be a major source of throughput supply" was reasonable. Commission Report at 65.

In summary, the court determines that the record viewed *in toto* demonstrates that substantial evidence supports Commissioner Rohr's findings that the regional industry was threatened with material injury.

### VII. Commission Investigation of Support for Petition

██ In their final argument, plaintiffs challenge the Commission's refusal to evaluate petitioners' standing to bring the petition that was asserted in plaintiffs' request for termination. Plaintiffs contend that the theory relied upon by the Commission—that

---

7. Imports subsequently declined, however, the Commission may permissibly give little weight to decreases in imports following initiation of an investigation or preliminary dumping determination by Commerce. *Rhone Poulenc, S.A. v. United States,* 8 CIT at 47, 53, 592 F.Supp. 1318 (1984).

8. Commissioner Rohr concluded that "[s]uch investments would be extremely uneconomical unless used, and it is reasonable to believe that Japanese cement could be a major source of throughput supply." Commission Report at 65.

9. *See* Confidential Document No. 39 G at A–30 and A–75–A–76, Confidential Document No. 19 at 112–117.

such an investigation was only within Commerce's discretion—was inappropriate here. Plaintiffs contend that while the Commission's position may be permissible in certain cases, the Commission must analyze standing in the present action because Commerce abdicated its responsibility to do so, and, in any event, the standing evaluation depends on the final determination by the Commission. Specifically, they argue that the issue of whether the petition was brought on behalf of the industry derives from the Commission's delineation in its final determination of the applicable regional industry. Consequently, even if Commerce had acted appropriately, it could not have evaluated standing.

In response, the Commission argues that statutory and case law provide that Commerce alone maintains the authority to investigate petitioners' standing, or to dismiss petitions on these grounds.

The governing statute, 19 U.S.C. § 1673a(b) (1988), mandates that an antidumping petition must be filed "on behalf of an industry." Subsection (c) of Title 19 United States Code, Section 1673a (1988) provides that *Commerce* shall determine whether the petition alleges all necessary elements within 20 days after filing of the petition.

Additionally, the Federal Circuit recently explained in *Suramerica de Aleaciones Laminadas, C.A. v. United States,* 10 Fed.Cir. (T) ——, 966 F.2d 660, 665 n. 6 (1992) in regard to the statutory requirement that a petition be filed on behalf of an industry, that:

> Although both Commerce and the [Commission] are "charged" with administering different parts of the Act, it is Commerce who determines that a petition is sufficient to cause the initiation of investigations—that the statutory requirements are satisfied. The [Commission]'s position in its brief is that it defers to Commerce's initial determination, and that only Commerce can review that determination. This is a reasonable and permissible interpretation of the Act's delineation of respective responsibilities.

Therefore, the court's obligation is to ascertain whether the Commission decision to defer to Commerce was again a "reasonable and permissible" determination. The court finds that under the facts of this action, the Commission's finding was so supported. None of the "unique" facts of this case which plaintiffs' claim distinguish it from *Suramerica,* actually do so.

As in *Suramerica,* 966 F.2d at 660, the Commission found that Commerce was the appropriate agency to make standing determinations. The Commission's interpretation did not cause plaintiffs to forfeit a challenge to any aspect of standing. Moreover, as the Commission majority noted in its determination, the request for termination submitted to the Commission was not supported by any confidential information developed in the Commission investigation; and "all the facts on which the Termination Request [was] based were known to respondents before the deadline established by Commerce's regulations for challenging a petitioner's allegations of standing, and therefore such a challenge could have been brought before Commerce in a timely fashion." Commission Report at 12–13.

The court therefore concludes that the Commission's decision in the action to defer the standing analysis to Commerce was reasonable and permissible.

## CONCLUSION

For the reasons provided above, this court holds that the Commission's final determination regarding gray portland cement and cement clinker from Japan was, in part, supported by substantial evidence and in accordance with law, and in part insufficiently supported and not in accordance with law. Accordingly, the Commission's determination is sustained in part, and plaintiffs' motion for remand is granted in part.

## ORDER

Plaintiffs' Motion for Judgment on the Agency Record and for Remand to the International Trade Commission, having been submitted for decision and upon consideration of the briefs submitted, oral argument, and all other papers filed herein, it is hereby:

**ORDERED** that plaintiffs' Motion for Judgment on the Agency Record and for Remand is hereby denied in part, and the International Trade Commission's final determination is sustained in part; and it is further

**ORDERED** that plaintiffs' Motion for Judgment on the Agency Record and for Remand to the International Trade Commission, is hereby granted in part; and it is further

**ORDERED** that on remand, the International Trade Commission is directed to determine whether an industry in the United States was materially injured, was threatened with material injury, or the establishment of an industry in the United States was materially retarded by reason of the subject imports in accordance with the views expressed in the opinion; and it is further

**ORDERED** that the International Trade Commission shall report the results of its remand determination to the Court within 60 days of the date of this Order.